RITA M. BOYLE *vs.* CAMBRIDGE GAS LIGHT COMPANY (and two companion cases[1]).

Middlesex. November 3, 1953. — January 19, 1954.

Present: QUA, C.J., WILKINS, SPALDING, WILLIAMS, & COUNIHAN, JJ.

*Proximate Cause. Gas.*

In an action of tort by the occupant of an apartment against a gas company for injuries due to inhalation of carbon monoxide gas resulting from improper combustion of illuminating gas used to operate a gas refrigerator in the apartment, the evidence left it conjectural whether such improper combustion was due to repairs and adjustments made to the refrigerator by the gas company almost a month before the injuries or to some more recent cause for which the gas company was not responsible, and did not warrant recovery.

THREE ACTIONS OF TORT. Writs in the Superior Court dated November 23, 1949.

The actions were tried before *Giles,* J.

*Paul J. Dolan,* for the defendant.

*Charles E. Cunningham,* (*Daniel W. Donahue* with him,) for the plaintiffs.

WILLIAMS, J. These are three actions of tort, two by Rita M. Boyle and Kevin W. Boyle to recover damages for personal injuries and the third by Rita M. Boyle as

[1] The companion cases are by Kevin W. Boyle and by Rita M. Boyle as administratrix of the estate of William A. Boyle against the same defendant.

administratrix of the estate of William A. Boyle to recover
for his conscious suffering and death. The cases were tried
with three similar actions brought against Cambridge
Housing Authority. Verdicts were returned for the housing
authority and for the plaintiffs in the actions against the
defendant. The defendant's exceptions in each case are to
the denial of a motion for a directed verdict based on the
insufficiency of evidence, to the denial of a motion for a
directed verdict based on variance of the proof from the
allegations in the declaration, to the admission of evidence,
to the denial of requests for rulings, and to the judge's
charge.

In the plaintiffs' declarations it is alleged that on or
about August 17, 1949, the defendant "had the sole care,
control and maintenance of a certain gas-refrigerator located
in apartment number sixty-seven at number 17 Newtowne
Court . . . Cambridge," occupied by William A. Boyle
and family; that the defendant was bound to keep said
gas refrigerator in good repair and condition and was bound
to prevent its gas from escaping therefrom; but that the
defendant negligently caused and permitted said gas re-
frigerator to be out of repair and gas to escape therefrom
whereby Rita and Kevin were injured and William A.
Boyle was injured and died.

On the date alleged William A. Boyle, his wife Rita, and
his four months old son Kevin occupied one of the apart-
ments in a building of the housing authority at 17 New
Towne Court, Cambridge, under a lease from the housing
authority executed in November, 1948. The apartment
consisted of a living room, bedroom, kitchen and bathroom.
The kitchen fixtures included a gas range and a gas re-
frigerator. The tenant paid the authority for the gas
supplied to the apartment. This gas was sold to the au-
thority by the defendant under the terms of a written
contract between it and the authority, title to the gas
passing from the defendant to the authority at the point
where it was metered on the premises of the authority. So
far as it appeared the gas range and the gas refrigerator in

the Boyle apartment were owned by the authority. There was no evidence that they were purchased from or installed by the defendant. It was provided in the above contract that the defendant should "give free material and labor for the maintenance and repair of all refrigerators" in the buildings. When one of the gas appliances was out of order, it was the practice for the tenant to notify the housing authority and the authority to notify the defendant who would send a repair man to take care of the matter.

There was evidence that the Boyles left their apartment on the afternoon of August 16, 1949, and returned after midnight in the early morning of August 17. At some time Mrs. Boyle awoke and heard her husband say that he felt sick. Apparently she then lost consciousness. At about 10:30 P.M. of the same day Boyle was found in the bathroom dead, and Mrs. Boyle in a semiconscious condition. The child was ill. The windows of the apartment were closed and the jet of the refrigerator was burning. The jets of the gas range were not open. A subsequent test of the blood of the dead man disclosed that it was saturated with carbon monoxide to the extent of fifty-one per cent. His death was caused by carbon monoxide asphyxiation. There was ample evidence that this gas came from the refrigerator and resulted from the improper combustion of illuminating gas which was the fuel used in operating the refrigerator.

There was evidence that in the previous July Mrs. Boyle "had trouble with the gas refrigerator." Being unable to get in touch with the agent for the housing authority, she called the defendant. A man came to the apartment and took off the front of the refrigerator and "fixed something under there." The next morning two men came who "took the whole refrigerator out from the wall and . . . cleaned it with something that looked like a vacuum cleaner." They "put the refrigerator back together again and after that occasion she had no other trouble with it." There was in evidence a report by the defendant to the authority that on July 21, 1949, it "cleaned the motor of the refrigerator,

removed accumulated dust from the vents, adjusted the equipment, lit the burner, and checked it as in good working condition."

The medical examiner arrived at the apartment about 11 P.M. on August 17. A window had been broken out by a police officer and the refrigerator was still "on," and burning with a blue flame. The medical examiner detected no odor and "thought" that he examined the flue. He ordered that the broken pane of glass be replaced and the apartment be kept closed. He returned on the 18th at which time nothing was touched in the apartment. On the 20th he was there with Dr. Joseph T. Walker, a chemist employed by the department of public safety. The broken pane had been replaced. Dr. Walker made certain observations and tests. He observed that the flame in the burner of the refrigerator was a blue flame with no tinge of yellow and had a central light blue cone in it of approximately three quarters of an inch in length. In the living room, bedroom and kitchen he found two hundred parts per million of carbon monoxide and eight hundred parts in the exhaust of the refrigerator. He also noticed an odor "that one gets from a stack hot water heater in which illuminating gas is burning and in which the flame impinges on the cold surfaces of the coil." Further tests were taken on August 24 when the burner of the refrigerator was removed and examined.

It is apparent that the defendant had no control over the refrigerator except on July 20 and July 21 when it corrected some undisclosed difficulty with the refrigerator, "adjusted the equipment, lit the burner, and checked it as in good working condition." Whether the repairs and adjustments then made could be found to have caused the improper combustion which was present on August 17 is the question to be decided.

The plaintiffs called as witnesses three recognized experts, one of whom was Dr. Walker. He testified that carbon monoxide is given off when any material burns, particularly under improper combustion, or improper conditions where

the combustion is not very complete.  It is given off by the flue of a stack hot water heater when the gas flame hits the coils through which the water passes.  It is present in the exhaust gas of an automobile and one can get it from a fireplace or gas stove when the doors and windows are closed.  When a mixture of illuminating gas and air is not correct the flame ordinarily has a much elongated blue cone or no recognizable inner blue cone and when very poor gives a yellow flame.  The flame he observed in the present case was a "perfectly appearing flame."  His opinion that there was improper combustion was based on odor and the presence of the carbon monoxide.  It was brought about by not having the proper amount of air to mix with the gas. He testified that he did "not know why it did not have the proper amount of air."  Among several others, one of the causes "could be the condition of the unit, burner and combustion chamber.  That condition would be with respect to some blocking up of orifices or something else."  There were other things besides the adjustment of the burner that could do it.  One could adjust the burner and get a perfect adjustment and something in some other place might cause an improper mixture.  If one blocked the flue somewhere along the line, that would prevent the air getting in and around the flame.  The witness was asked what if any substance the outer jacket or tube around the burner con-tained but the record does not state the answer of the witness.

The second expert witness was George S. Reichenback, Junior, an industrial hygiene engineer, who visited the apartment on August 24.  He testified that improper com-bustion is due to either primary or secondary air being too small in quantity for the amount of gas supplied to the refrigerator, in which case he would expect "a good proba-bility of finding some carbon deposit on the stack."  The refrigerator has no flue connected to the outside; the only place for the waste gases to go is up the back of the cabinet. "Usually there is a piece of sheet metal that comes in a cross section and the gas is exhausted up the back; the rear upper of the cabinet of the box."  A good blue flame

and a good cone are "a rule of thumb measurement for good combustion." The "supply of air depended upon one thing at least, on the cleanliness of the burner, of the openings that let the air into the primary and secondary passages. An obstruction in the flue would also cut down the draft which would cut down the secondary air. The obstruction of the primary or secondary air or of the flue would be brought about by the presence of some foreign matter."

The third expert witness was W. Ward Powell, Junior, a mechanical engineer. He testified that the gas flame burns in a combustion chamber to which is attached a stack or a chimney where burned gases are relieved from the equipment. Any disturbance which would reduce the proper amount of oxygen required to get the complete combustion will produce carbon monoxide, in which case one would expect a lower temperature in the combustion chamber "and may get a carbon deposit or fume deposit on the sides or surfaces of the combustion chamber." One may have an improper adjustment but still get a blue flame. "One can tell by the appearance of the stack, or the combustion chamber, whether the unit has been properly adjusted or not . . . by merely the physical appearance. The easiest way to tell is that if the flame temperature is reduced, forming incomplete combustion, part of the fuel will actually carbonize, or form a carbon deposit, commonly known as soot, a carbon deposit in the lower temperature sections of the flue passages. If there is carbon present, or if there is a deposit of carbon present, it is a positive indication that the unit is not burning properly. The heavier particles of soot are thrown up against the wall of the stack." One would not expect to find carbon monoxide produced from a unit which was properly adjusted. "If a man came along and adjusted a burner by regulating the amount of air either increasing it or decreasing it, whatever it needed, to go in and mix with the gas and got a perfect flame and sometime later it was found that there was an improper mixture in there, the witness would not say that back at

the time that the man adjusted it and had a perfect flame or perfect combustion that that would be an improper adjustment. If at the time he adjusted it and had a perfect flame or perfect combustion that would be a proper adjustment. When the witness used the word 'improper' it was for the condition then existing. If the man is getting a yellow flame or monoxide then the adjustment isn't proper and he ought to go back and make another one." "It could mean that it was improper a month ago yes or two months ago or six months ago. Anything that gives a shortage of air in either the primary air or the secondary air is going to give an improper adjustment, and that can occur at any time due to anything that gets in and blocks the passage of air. It could occur instantaneously. Anything that gets in and blocks the passage of air either primary or secondary air ducts could spoil the adjustment. The primary air is air from the outside, from the kitchen or from whatever room the burner happens to be in. The primary air is in communication with the outside. The secondary air is the air that is drawn in and goes into the combustion chamber. . . . An insufficiency of either primary air in the mixing chamber or secondary air on the outside which goes up over the top of the flame in the combustion chamber is an adequate cause for the production of carbon monoxide." "Obstructions in the stack or at the burner itself would prevent a proper amount of air from going through the proper opening and that result could be brought about instantaneously even by setting a book on top of the stack. Any instantaneous action like that is a possibility but it is not probable."

There was a singular absence of evidence respecting the condition of the burner, combustion chamber, and flue at the time they were examined after the accident. If there was imperfect combustion due to maladjustment of the burner on July 21, it is reasonable to suppose that in the meantime carbon would have collected on some part or parts of the appliance. The expert witnesses suggested various possible causes for the release of the carbon mon-

oxide gas, namely, dirt in the orifices of the burner, impingement of the flame on metal, and impediment in the flue. No one of these possible causes was negatived by evidence. We think the evidence was insufficient to warrant the jury in finding a probability that the imperfect combustion on August 17 was due to an adjustment of the appliance by the defendant in July instead of to some more recent and immediate cause. The reason for its existence was left to conjecture. *Morrow* v. *Otis*, 251 Mass. 65, 67. *Magnuson* v. *Gottholm*, 261 Mass. 477. It is unnecessary to consider the further question of whether the evidence would warrant a finding of the defendant's negligence. The motion of the defendant for a directed verdict based on the insufficiency of the evidence should have been allowed in each case. We need not discuss the other exceptions.

*Exceptions sustained.*
*Judgments for the defendant.*