336 Mass. 261 (1957)
143 N.E.2d 542
WILLARD L. DeMARTIN
vs.
THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY.
Supreme Judicial Court of Massachusetts, Suffolk..
July 1, 1957.
February 4, 5, 1957.
Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, & WHITTEMORE, JJ.
Noel W. Deering, (David W. Walsh with him,) for the defendant.
Roger J. Donahue, (John L. Simonds with him,) for the plaintiff.
WILLIAMS, J.
This is an action in tort to recover for personal injuries incurred by the plaintiff on April 6, 1953, while working in the defendant's railroad yard in Worcester. The case is here after a verdict for the plaintiff on the defendant's exceptions to rulings on evidence and to the denial of its motion for a directed verdict in its favor.
There is little dispute as to the facts. The plaintiff was a welder in the employ of Roy Construction Company, hereinafter referred to as Roy. On the day of his injury Roy was engaged under a contract with the defendant in making substantial alterations in the latter's yard at Southbridge Street. The defendant was a self insurer under the workmen's compensation act. The contract called for Roy to furnish all labor, materials, equipment, transportation and insurance, required for the removal of track and ties, the demolition of coal chutes, hopper, pressure tank and house, engine house, other houses, garage, cars, the relocation of diesel fuel lines, the relocation of steam line outlet, a "survey location," a "clean up job" and the grading of the area at a total price of $30,150. The price for "relocation diesel fuel lines" was $1,100. The contract was dated March 11, 1953, and by April 6 the required work apparently had largely been completed by the contractor. There remained the relocation of the diesel fuel lines which were used to pump oil from tank cars to diesel engines. The pipes had been laid under ground and ran through a pump house in which the apparatus for pumping was located. The contemplated relocation required that the pipes be taken up, the pump house moved, the pipes relaid in a different location, and the necessary connections made.
One Tetreault was general superintendent of the work for *263 the defendant. Roy employed on the job a supervisor and a labor foreman, through whom Tetreault gave orders as to the work to be done.
There was evidence from the plaintiff that he had been employed as a welder by Roy for about two months. Previously thereto he had worked as a welder for twenty-two or twenty-three years, principally on steam fitting, but had never welded pipes which had contained fuel oil. He knew that Roy had a contract with the defendant and during its performance had been to the yard once or twice to weld temporary fuel lines. On Saturday, April 4, Roy's manager told him to get his equipment together and to go over to the yard early Monday morning and report to Tetreault who would tell him what he wanted done. On Monday the plaintiff, taking with him the welding generator, bottles of acetylene and oxygen and "all the equipment he needed," reported to Tetreault. Zingarelli, Roy's labor foreman, with the men in his gang, had taken up the old fuel line, cut the pipe into lengths and laid them on the ground beside the new trench which had been opened. Zingarelli knew that the pipes had contained oil because of the drippings which came from the sections of pipe as they were taken out. There was testimony by the plaintiff that Tetreault "told me what he wanted to do with the pipes and how he wanted them to run, and I asked him about if those pipes were all right to work on. Those were the pipes? And he said, `Yes.'" The plaintiff welded three or four lengths of pipe and they were lowered into the trench. He then waited to complete the welding until Roy's employees had moved the pump house with a crane. The pipe from the pump house was to be connected with the pipe in the ground by use of two elbows or "tube turn[s]" and a riser. There were two flanges in the short length of pipe between the pump and the upper elbow. Tetreault gave the plaintiff a piece of steel from which to cut a "blank," which was a thin piece of metal to be inserted loosely between the flanges to keep "slag or sludge" from getting into the pump, and told him "every step to make." A pipe fitter having bolted the *264 "blank" in place, the plaintiff said to Tetreault, "Is everything all right now, Leo?" and Leo (Tetreault) replied, "I believe everything is all right. Go right ahead with it now." The plaintiff put on his goggles, gloves and welding equipment and started to weld the joint from "the eccentric reducer onto the pipe which was open. The riser that comes up to that eccentric reducer goes down into that tube turn."
He squatted in the trench and used an oxyacetylene torch and a steel filler rod with which to "fill in that joint, [and] to fuse it together." He had worked ten or fifteen minutes and had about "two inches more of weld to make" when there was a roar, and a flash came from the quarter inch of space "between the two joints." It was "a roaring flame like a blow torch" and he was severely burned.
An expert called by the plaintiff testified that the cause of the flash explosion could have been residual oil on the inside of the pipe; and that one would get some pure hydrogen when diesel fuel is heated to a high temperature and that would have a high explosive potential. Subject to the defendant's exception he was allowed to read the following passage from a manual of the American Welding Society entitled "Safe Practices for Welding and Cutting Containers that Have Held Combustibles." "Welding or cutting of containers that have held combustibles should be attempted only by experienced welders or cutters and under the direct supervision of persons familiar with the characteristics of the previous contents."
He testified that there were three possible explanations why there was an explosion when one joint was welded and not when another joint was welded. One was that the welder might have worked longer on the last joint than on previous joints and therefore heated more pipe and vaporized more oil. A second was that by reason of the blank there was no open end on one side and the gas might have been less diluted with air. He did not consider it good welding practice to have put the blank in the flange. A third possible explanation, but not a likely one, was that on a *265 wide gap joint liquid steel could drop down into the vertical section of the pipe.
"[T]here was some reduction in likelihood of a hazardous explosion in using an arc weld [rather] than in using an acetylene torch. The acetylene torch is a lower temperature source and requires a longer time to achieve a fusion joint, `and in that greater length of time you heat up more pipe, which in this case is bad.' ... He would not advocate any welding on a pipe where fuel oil had been used without some considerable precautionary steps. It might involve cleaning out in some method, and there are other precautions. Whether or not the plaintiff as an `experienced welder' used the ordinary precautions would depend upon the welder's particular experience. If he had been experienced in the welding of oil pipe lines then he certainly did not take the necessary precautions, but if he hadn't done that kind of welding, he wouldn't necessarily know enough to recognize the danger."
Regulations of the board of fire prevention regulations promulgated under G.L. (Ter. Ed.) c. 148, § 10, as amended, relating to the licensing of buildings or structures to be used for the storage of inflammable fluids (§§ 9 and 13, as amended) and regulations promulgated under § 38, as amended, relating to permits for the maintenance and use of tanks of more than 10,000 gallons capacity (§ 37) were admitted in evidence, over the objection and exception of the defendant. It was conceded by the defendant that it had obtained no license or permit for the tank cars from which oil was pumped to the diesel engines. At the conclusion of the evidence the judge directed a verdict for the defendant on count 2 of the plaintiff's declaration wherein recovery was sought under the Federal employers' liability act and subject to the defendant's exception denied its motion for a directed verdict on count 1 for negligence.
In support of its motion the defendant urged, first, that the plaintiff could not maintain his action at common law on the ground that by virtue of G.L. (Ter. Ed.) c. 152, § 18, he was restricted to recovery under the workmen's compensation *266 act and, second, that there was no evidence of the defendant's negligence. The judge was not in a position to rule upon the effect of the compensation act without preliminary findings of fact. He therefore properly submitted to the jury (Cozzo v. Atlantic Refining Co. 299 Mass. 260; Cannon v. Crowley, 318 Mass. 373) the question, "Did the injuries of the plaintiff ... arise out of and in the course of employment which was a part of or process in the trade or business carried on by the defendant railroad and not merely ancillary or incidental to it?" As the jury answered "No" and returned a verdict for the plaintiff, the question for decision is whether there was evidence from which they could find that the defendant was negligent.
The plaintiff was on the defendant's premises by invitation to assist in the work for which his employer had contracted and particularly to do the welding required in relocating the diesel fuel lines. He assumed those risks incidental to the work which his employer Roy had sent him to perform which were obvious or apparent on proper examination. Favereau v. Gabele, 262 Mass. 118, 119, and cases cited.
The railroad's duty was to "warn him of the dangers incident to his work which he did not know of or appreciate, and could not reasonably have discovered ... [but] which dangers ... [it] knew or should have known." Carpenter v. Sinclair Refining Co. 237 Mass. 230, 234. In general there is "no duty to warn unless the person on whom the duty would be cast has some reason to suppose that a warning is needed." Cadogan v. Boston Consolidated Gas Co. 290 Mass. 496, 499-500. Hyland v. Seaver, 312 Mass. 535, 539.
The plaintiff contends that he did not know that the pipes he was to weld had contained fuel oil, that he had no experience in welding pipes which had contained oil, and that Tetreault should have warned him of the condition of the pipes and the danger incidental to welding them. The plaintiff's evidence shows that the condition of the pipes was known to Roy's foreman and presumably to other employees who had removed them from their former location. *267 Previous to the accident the plaintiff had already welded together several of the pipe lengths which had been taken up. There is no evidence from which it could be inferred that Tetreault had reason to think that any warning to the plaintiff of their condition was required. See Trott v. Yankee Network, Inc. 335 Mass. 9, 14. He could rightfully assume that the contractor Roy knew of the condition of the pipes which its employees had taken up (Sarna v. American Bosch Magneto Corp. 290 Mass. 340, 343) and had provided an experienced welder competent to reconnect them. See Campbell v. Rockland Trust Co. 311 Mass. 663, 667. It did not appear that Tetreault had knowledge of any risk in welding superior to that of the plaintiff, of whom the expert testified that if he "hadn't done that kind of welding, he wouldn't necessarily know enough to recognize the danger." The evidence does not support the plaintiff's contention that Tetreault gave him an assurance of safety. See Burwick v. McClure, 318 Mass. 626, 631; Carriere v. Merrick Lumber Co. 203 Mass. 322, 327; Archer v. Eldredge, 204 Mass. 323, 327. Tetreault told him only where and when the welding was to be done. He did not tell him how it should be done. His language was nothing more than that to be expected from a general superintendent to one charged with the performance of a specific expert job, namely, that it was all right for him to proceed with his work. The insertion of the blank was no part of the welding process. Whether its use was causally related to the explosion is a matter of conjecture. Boyle v. Cambridge Gas Light Co. 331 Mass. 56, 63.
We do not pause to consider whether the plaintiff as the employee of an independent contractor must, in the situation disclosed by the evidence, be held to have assumed the risk of welding pipes which had contained oil, see Boisvert v. Ward, 199 Mass. 594; Archer v. Eldredge, 204 Mass. 323; Pilling v. Hall, 251 Mass. 425, 426-427; Favereau v. Gabele, 262 Mass. 118, 119; Taunton v. Hoar, 288 Mass. 326, for we think there was no evidence of the defendant's violation of any duty owed to him.
*268 The regulations, to the admission of which the defendant excepted, may be disregarded. They were erroneously admitted in evidence. The tank cars were not buildings or structures within the purview of pertinent license requirements. See G.L. (Ter. Ed.) c. 148, § 1, as amended; Nowell v. Boston Academy of Notre Dame, 130 Mass. 209, 210; Small v. Parkway Auto Supplies, Inc. 258 Mass. 30, 33; Jenney v. Hynes, 285 Mass. 332, 335; H.W. Robinson Carpet Co. v. Fletcher, 315 Mass. 350, 353; Hemenway v. Bartevian, 321 Mass. 226, 229. Nor did it appear that they were tanks of more than 10,000 gallons capacity requiring permits. The only evidence of their capacity was a photograph which showed a label on one of the cars "8,111 gallons." If the regulations were properly in evidence it is plain that their alleged violation had no causal connection with the plaintiff's accident and furnished no evidence of the defendant's negligence. In view of our conclusion on this issue of negligence it is unnecessary to discuss the admissibility of the manual of the American Welding Society. The motion of the defendant for a directed verdict should have been allowed.
Exceptions sustained.
Judgment for the defendant.