FRANCES MARINO, administratrix, *vs.* TRAWLER EMIL C, INC. & others.

Suffolk.    November 4, 1965. — January 6, 1966.

Present: SPALDING, WHITTEMORE, KIRK, SPIEGEL, & REARDON, JJ.

*Jones Act. Fish Spotter. Seaman. Airplane. Negligence,* Dangerous work, Fish spotting, Independent contractor, Airplane, Assumption of risk. *Agency,* What constitutes, Independent contractor, Fish spotter. *Proximate Cause. Practice, Civil,* Amendment, Parties.

A fish spotter, who had never served in any capacity on board fishing boats for which he was spotting fish from an airplane, as a matter of law was not a "member of the crew" of any of the boats and his personal representative was not entitled to recover under the Jones Act, 46 U. S. C. § 688 (1952), from the owners and operators of the boats for his death in a collision with another plane.    [93–94]

Evidence in an action that a pilot of an airplane hired by the defendants, the owners and operators of fishing boats, flew his plane and spotted fish simultaneously and usually did so in the general proximity of a second plane also engaged in fish spotting for the boats warranted findings that the activity of the planes was of an inherently dangerous character and that the defendants, who knew the conditions under which the fish spotting was being performed, negligently failed to take special precautions to guard against a collision of the two planes and were liable under G. L. c. 229, § 2C, for the death of a fish spotter riding in the second plane when it collided with the first plane, even if the pilots of the two planes were independent contractors.   [94–95]

Evidence in an action against the owners and operators of fishing boats warranted findings that the pilots of two airplanes engaged in spotting fish for the boats were, while circling schools of fish to direct the boats when to drop their seines, subject to any reasonable orders of the defendants in regard to the altitudes, speed, or movements of the planes and servants of the defendants even though the defendants had no right to control every detail of the operation of the planes.   [96–97]

In an action under G. L. c. 229, § 2C, against the owners and operators of fishing boats for the death of a fish spotter riding in an airplane engaged in spotting fish for the boats when it collided with another plane so engaged, evidence warranted a finding of various factors of negligence for which the defendants were responsible and which, either separately or in combination, had a causal relation to the collision.   [97]

A fish spotter riding in an airplane did not as matter of law assume the risk of all possible causes of collision with another plane engaged in spotting fish at the same time in the same area.   [97–98]

In an action seasonably commenced under the death statute, a motion filed after the expiration of the statutory period for commencement of the action to amend the writ by bringing in a new party defendant was properly allowed.   [98]

TORT.   Writ in the Superior Court dated July 12, 1960. A motion to amend the writ was allowed by *Lurie, J.*

The action was tried before *Bolster, J.*

*Harry Kisloff* (*Peter J. Needham* with him) for the plaintiff.

*James A. Whipple* for the defendants Trawler Emil C, Inc. & others.

*Edwin R. Trafton* (*William J. Ryter* with him) for the defendant Rose Marie, Inc.

SPALDING, J.   The plaintiff, administratrix of the estate of Michael Marino, brings this action of tort to recover for Marino's death under the Jones Act (46 U.S.C. § 688 [1952]), or alternatively under the Massachusetts death statute (G. L. c. 229, § 2C).   The defendants are the own-

ers and operators of four fishing vessels out of Gloucester (Hazel B, Pilgrim, Rosie & Gracie, and Rose Marie).

The case was tried to a jury, and at the close of the evidence verdicts were directed for all of the defendants on the Jones Act counts, subject to the plaintiff's exceptions. Motions for directed verdicts on the Massachusetts death statute counts were denied, and the jury returned a verdict against each defendant. The case comes here on bills of exceptions of the plaintiff and the defendants. The question raised by the plaintiff's bill is whether the judge erred in directing verdicts for the defendants under the Jones Act counts. The defendants' bill brings before us exceptions to the denial of their motions for directed verdicts, to the judge's refusal to give certain requests for instructions, and to portions of the charge.

We summarize the relevant evidence as follows: The four fishing vessels of the defendants were engaged in the summer of 1958 in seining porgies from Massachusetts Bay. Before the season opened, and together with the owner of a fifth vessel, the Puritan, the defendants had contracted orally to sell to the Gloucester By-Products Company (Gloucester) their entire catch. As part of this contract, the executive manager of Gloucester, Edward MacLeod, promised to obtain the services of a plane to spot fish for the boats.[1] MacLeod hired Harold Fogg, who had performed in a similar capacity in prior seasons "for all or most of . . . [the] boats." Fogg was to be paid $12 per hour, which was to cover the use of his plane, gas and oil, and his fish spotting services. Although Gloucester paid Fogg, the owners of each of the five boats reimbursed Gloucester for one sixth of the cost of Fogg's services. None of the defendants took part in the negotiations with Fogg, nor did they inquire into his professional qualifications.

"About midway during the 1958 porgy season," the captains of several of the defendants' boats discussed with MacLeod the possibility of hiring a second plane to spot

---

[1] Until a few years prior to the 1958 season, fish spotting was performed by the mastheadsman stationed in the crow's nest of each vessel.

fish. Fogg suggested another plane owned by a pilot named Auclair, and he was hired on terms similar to Fogg's. Auclair could not spot fish, however, and none of the defendants would assume the cost of providing a spotter to ride in the plane. MacLeod consequently hired Marino (the decedent) for $300 for a seven day week, his salary to be paid by Gloucester without reimbursement by any of the defendants. From the latter part of July, 1958, Marino flew with Auclair, and at times with Weceza who occasionally substituted for Auclair.

Both the Auclair and Fogg planes were registered with the Federal Aviation Agency (FAA) and with the Massachusetts Aeronautics Commission (MAC) as private planes. Auclair had a commercial pilot's license duly registered with both agencies. Fogg had a duly registered private pilot's license but not a currently valid medical certificate as is required by MAC. Weceza held a private pilot's license registered with FAA but not with MAC; nor did he have a medical certificate registered with MAC.

Upon hiring Fogg, MacLeod inquired about his license, looked at it, but did not read it. He did not ask for nor did he ever see Fogg's plane registration. MacLeod had no knowledge of such matters as pre-flight plans and the like, nor did he ever discuss them with Fogg; but he knew that a commercial pilot's license was required to pilot a plane engaged in fish spotting. He never conversed with Auclair concerning his pilot's license or plane registration, although he told Fogg that the other pilot "must have a commercial pilot's license." MacLeod first learned of Weceza after the accident.

Auclair testified that Fogg never mentioned any pre-flight plans concerning altitudes at which the planes should fly. He stated that when he first asked Fogg about using Weceza on occasion, Fogg did not inquire about Weceza's license but said, "If he is capable, let him go."[2]

---

[2] Rules and regulations of the FAA, which were introduced into evidence, included the following:

Rule 43.41, "No person shall pilot an aircraft under authority of a pilot's certificate issued by the Administrator unless he has a medical certificate showing that he has the physical requirements appropriate to a rating."

Generally, the planes left early in the morning to search a fishing area designated by the defendants, the details of the search being left to the pilots. Upon locating a school of fish the spotter would direct one of the boats to the fish by radio telephone. When approaching the fish, most of the crew would be ordered into the seine boat, and a member of the crew would place himself at the masthead. From there, he could communicate by radio with the spotter who would direct him to the fish and tell him when to drop the seine. The plane would then leave to find another school. One of the ship's captains testified that "he gave a few orders to Marino if he . . . [flew] too close to the fish" during this operation, but never directed at what height or what course he should fly.

On August 28, the four vessels of the defendants were fishing the Plymouth Harbor area. The day was clear with seven to eight miles' visibility and there were three planes in the air spotting fish. At the moment of the accident, Fogg was circling a school of fish for the Pilgrim and directing the seine boat into position for dropping the nets. There was some delay by Fogg in giving the signal to drop. Upon looking up, the Pilgrim's acting captain, Frontiero, saw the planes of Fogg and Auclair about twenty feet apart and on a collision course. They crashed and dropped into the sea, killing all of the occupants: Fogg, Marino, and Weceza, who was substituting for Auclair that day. At the time of the accident, the crews of the other three vessels were transferring fish to their mother boats. All were within the general area and some of the crews' members heard or witnessed the crash.

---

Rule 43.60, "A private pilot shall not pilot aircraft for compensation or hire except that he may pilot aircraft in connection with any business or employment, if the flight is merely incidental thereto."

Rule 43.61, "A commercial pilot may pilot aircraft for hire."

Rule 60.15, "No person shall operate an aircraft in such proximity to another aircraft so as to create a collision hazard."

Rule 60.12, "Amended April 10, 1957. Special flight activities which require such preoccupation by the pilot with cockpit duties as would prevent adequate vigilance outside the cockpit for the purpose of collision avoidance without compensation for such reduced degree of vigilance by the use of a competent observer or chase aircraft or other equivalent arrangements, shall be evidence of careless or reckless operation."

Auclair testified that on the day of the accident oil was leaking from a gasket onto the "left hand corner of the front windshield and left front side window" of his plane, obstructing the vision of the pilot. He met Weceza at Marshfield at noon so that Weceza might relieve him, but neglected to tell him about the oil leak. Weceza left Marshfield around 12:20 P.M. "to join Fogg." The accident occurred between 12 noon and 1 P.M.

There was testimony that although no one was ever specifically assigned to look out for approaching aircraft, the crewmen and captains did in fact warn Fogg and Marino of such hazards. One witness testified that his boat warned the planes of other aircraft "once or twice a day, depending on the area." There was also testimony that on several occasions Fogg requested individual employees of the defendants to watch for other planes and to warn him of their presence.

From the fact of the collision, and from the lack of testimony as to any actual warning having been communicated, it would have been reasonable for the jury to infer that no communication of their proximity was given to either plane immediately prior to the crash. The chief investigator of the Massachusetts Aeronautical Commission testified that in his opinion the pilots should have had a pre-flight plan to fly at different altitudes.

It is agreed that neither Marino, Fogg, nor Auclair was listed as crew members of any of the four boats involved; that none of them served in any capacity on board the boats; and that the four boats were duly licensed.

### THE JONES ACT COUNTS.

There was no error in directing verdicts for the defendants on the Jones Act counts. We lay to one side the defendants' argument that this case is not within the admiralty jurisdiction of the United States, there having been no proof offered as to whether Marino died in the air or upon the sea (see *Weinstein* v. *Eastern Airlines, Inc.* 316 F. 2d 758 [3d Cir.]). We prefer to base our decision on the ground stated by the trial judge that there was no

evidence on which to base a finding that Marino was a "member of the crew" of any of the defendants' vessels. The United States Supreme Court has held that the benefits of the Jones Act are restricted to a "member of a crew of the vessel." *Swanson* v. *Marra Bros. Inc.* 328 U. S. 1. In a subsequent decision it held that it was for the jury to determine whether a pile driver who was injured while being transferred from a tug to perform work on the "Texas tower" radar station, after that structure was permanently anchored to the ocean floor, was a member of the crew of a vessel. *Grimes* v. *Raymond Concrete Pile Co.* 356 U. S. 252. This has not been construed to mean, however, that in no circumstances may a court rule as matter of law that the Jones Act is inapplicable because the complainant was not a "seaman" or a "member of the crew." See *Sullivan* v. *American President Lines, Ltd.* 206 F. Supp. 547 (N. D. Cal.). In the *Sullivan* case, the court pointed out that, as part of the "maintenance gang," the plaintiff was not required to perform duties aboard any vessel. In *Chance* v. *United States,* 266 F. 2d 874 (5th Cir.), the plaintiff, an aerial fish spotter, sought the status of a "member of the crew" of certain foreclosed fishing vessels in order to obtain a lien superior to that of a mortgagee under the Ship Mortgage Act of 1920. In upholding the trial judge's finding that the plaintiff did not qualify, the court pointed out that the minimum requirement for status as a "seaman" is actual presence on some type of vessel. It is agreed that Marino never served in any capacity on board any of the defendants' boats. We hold that this fact is determinative.

### THE MASSACHUSETTS DEATH STATUTE COUNTS.

1. There was sufficient evidence to take the case to the jury on the theory that the activity being performed by the planes was of an inherently dangerous character, such that the defendants could not avoid liability for injury to a third party even if the pilots were independent contractors. Whatever might be said of fish spotting per se, the fact that Fogg flew his plane and spotted simultaneously, usually in

the general proximity of the Auclair plane, created a circumstance likely to cause injury unless special precautions were taken. *Kunan* v. *DeMatteo,* 308 Mass. 427, 429. *Whalen* v. *Shivek,* 326 Mass. 142, 151. *Ducey* v. *Springfield Co-op. Bank,* 341 Mass. 449, 450–451. The defendants' argument that they lacked the ability to recognize this danger or the need for special precautions is without merit. Compare *Thurlow* v. *Provincetown,* 337 Mass. 450, 455. The defendants knew that Fogg flew alone, several were specifically asked to warn him of other planes, and all of them at various times endeavored to warn him whenever other aircraft were sighted. These circumstances were conditions of the work being performed. Compare *Doyle* v. *LaCroix,* 336 Mass. 484, 488, holding that cases of negligence incidental to nondangerous work are subject to a different rule.

2. The trial judge also left to the jury the question whether the planes' pilots were servants of the defendants, thus permitting the jury to find the defendants liable under the doctrine of respondeat superior. The defendants excepted to the failure of the judge to charge that the requisite right of control could not as matter of law be found on the evidence, to portions of the charge, and to the refusal to grant requested instructions.

Under our cases the existence of the master-servant relationship depends primarily upon the right of a principal to control the way in which work is performed for him. *McDermott's Case,* 283 Mass. 74, 76. *Doyle* v. *LaCroix,* 336 Mass. 484, 487. While it has been stated that the right to control must extend "farther into the minutiae of the alleged servant's conduct than merely telling him where to go" (*Patterson* v. *Barnes,* 317 Mass. 721, at 723) or must reach the "details" of the operation (*Gladney* v. *Holland Furnace Co.* 336 Mass. 366, 368), this does not rule out the possibility that a pilot may be the servant of persons who may lack the necessary knowledge to direct the details. See *Tetting* v. *Hotel Pfister, Inc.* 221 Wis. 141, 147. "One may be a servant though far away from the master, or so much more skilled than the master that actual direction and

control would be folly, for it is the right to control rather than the exercise of it that is the test." *McDermott's Case,* 283 Mass. 74, 77. In the case of an airplane performing a function closely related to and in coördination with an operation taking place below, the right of those on the ground to direct such things as the speed, altitude, and movements of the plane may be sufficient to warrant a finding that the master-servant relationship exists.

At the time of the accident, Fogg was circling a school of fish so that the seine boats of the Pilgrim would surround the entire school with their nets. He was generally in radio contact with the mastheadsman at such times. Frontiero, the acting captain of the Pilgrim, testified that he had ordered Marino in a few instances to fly less close to the fish. We are of opinion that a jury might properly infer from this evidence that during this phase of the fish spotting operation the conduct of the pilots was subject to any reasonable orders of the defendants in regard to their altitudes, speed, or movements. The cases holding that employees driving to a specific job in their own cars are not as a matter of law servants are distinguishable. See *Shea v. Bryant Chucking & Grinder Co.* 336 Mass. 312; *Gladney v. Holland Furnace Co.* 336 Mass. 366. In those cases there was no basis for inferring a right to control the route or the manner of operating the vehicle.

The judge was correct in refusing to give the defendants' requested instructions on the test for determining whether the pilots were servants at the time of the accident.[3] Re-

---

[3] Defendants' requested instructions: 11. "Under . . . [the death act counts] if you find that the operators of the planes were carrying on their own individual business which was not essentially a part of the defendants' general business and which individual business requires special skill and was of a temporary relation with the defendants for a specified piece of work, with control over the work remaining with the pilots, with the pilots supplying their own equipment, then the pilots are independent contractors and the defendants are not liable for the negligence of the pilots in the death of Marino." 12. "Under . . . [the death act counts] the primary test to determine whether the pilots were agents of the defendants or independent contractors of the defendants is the right to control the mode of doing the work and not the actual exercise of the work. The defendants' right to make suggestions is not a right to control and to make the pilots agents in this case. The right of control in the defendants must extend to the means of accomplishment and to the details of the work to be done."

quest No. 11 speaks merely of "control" when the right to control is the proper test. In request No. 12 the statement that "[t]he right of control . . . must extend . . . to the details of the work to be done" may properly have been regarded as capable of leading the jury to believe that they would have to find the right to control every detail of the plane's operation. The charge given allowed the jury to find the pilots to be servants of the defendants, "If you find that the boats had the right to control those pilots at any time, up aloft spotting or flying . . . if you find the boats had control over their movements." They were also instructed that "a person might well be a servant of another without that other having the right of control over his every movement." These instructions were appropriate in the circumstances of this case. The foregoing portion of the opinion holding that the question of control was rightly left to the jury is that of a majority of the court.

3. The defendants also argue that their motions for directed verdicts should have been granted since no positive evidence of the actual cause of the accident was introduced and thus any finding that negligence for which the defendants might be responsible caused the collision would be based solely on conjecture. See *Williams* v. *United Men's Shop, Inc.* 317 Mass. 319; *Smith* v. *Rapid Transit Inc.* 317 Mass. 469; *Boyle* v. *Cambridge Gas Light Co.* 331 Mass. 56, 62–63.

On the evidence, the jury could have found that the pilots' lack of qualifying credentials, the absence of preflight plans for set altitudes, the fact that Fogg spotted fish as he flew, Fogg's function in the encircling process, Auclair's failure to warn Weceza with respect to the oil leak, or to correct it, and the absence of any warning from below, either separately or in combination, had a causal relation to the collision. Such a finding would not rest on conjecture, but on facts from which the jury could conclude that these factors or some of them, rather than any sudden death or inexplicable event, caused the collision.

4. The defendants' contention that Marino must be held as matter of law to have assumed the risk of all possible

causes of the collision cannot prevail. The question was one of fact.

5.   We reject the contention of Rose Marie, Inc. that it could not be made a defendant by a motion to amend after the expiration of the statutory period for suing under the death statute.[4]   This point is governed by *Genga* v. *Director Gen. of Railroads,* 243 Mass. 101, 104, *Chandler* v. *Dunlop,* 311 Mass. 1, 7, and *Peterson* v. *Cadogan,* 313 Mass. 133.

<div align="right">

*Plaintiff's exceptions overruled.*

*Defendants' exceptions overruled.*

---

[4] The evidence on which this contention is based is: In the writ, which was seasonably served on all defendants named, one of the defendants, Rose Marie, Inc., was erroneously described as Rose Marie V, Inc.   After the expiration of the statutory period for commencing an action under the death statute, the plaintiff moved to amend the writ by bringing in Rose Marie, Inc. as a defendant and the motion was allowed.   Service was thereafter duly made on that defendant.