Rowlett W. Sneed and wife, Virginia H. Sneed, V. O Sneed and wife, Katherine J. Sneed, d/b/a Sneed Brothers,

*v.*

Anthony Henderson, by Next Friend, Ida

Jane Henderson.

366 S.W.2d 758.

(*Nashville,* December Term, 1962.)

Opinion filed April 3, 1963.

Rehearing Denied May 10, 1963.

EMMETT W. BRADEN and JOHN H. WILBUR, Memphis, ARMSTRONG, McCADDEN, ALLEN, BRADEN & GOODMAN, Memphis, of counsel, for plaintiffs in error.

JAMES R. WINCHESTER, Memphis, for defendant in error.

MR. JUSTICE WHITE delivered the opinion of the Court.

This is an action sounding in tort commenced by Anthony Henderson, an infant, suing by next friend, Ida Jane Henderson, seeking to collect damages for the alleged wrongful death of his mother under the circumstances hereinafter related. There was a jury verdict in favor of the plaintiff in the amount of $13,500.00, which was approved by the Trial Court. A motion for a new trial was seasonably made and filed by the defendants and overruled. An appeal in error was granted and perfected to the Court of Appeals where errors were assigned and considered by that Court. The majority opinion affirmed the judgment with a dissenting opinion being filed by the remaining member of the Court. We granted certiorari

and the matter has now been argued by counsel for the respective parties.

The principal questions involved as stated and acted upon by the Court of Appeals are:

1. May an illegitimate child of a mother maintain an action for her wrongful death under the law of Tennessee? and 2. Is there any competent, substantial and convincing evidence to support the verdict of the jury and the judgment of the Court?

■ This opinion shall dispose of these questions in the order stated. At the common law the right to recover for personal injuries was extinguished by the death of the injured party. However, this rule has been changed in most States by statute and in Tennessee by T.C.A. sec. 20-607, which provides that such right shall not be extinguished by death "but shall pass * * * to his children or to his next of kin * *."

T.C.A. sec. 1-304 provides that:—"Words importing the masculine gender include the feminine and neuter; * * * except when the contrary intention is manifest." Therefore, it is plain that T.C.A. sec. 20-607 applies equally whether the deceased injured party be male or female.

In the recent case of *Dilworth v. Tisdale Transfer & Storage Company, et al.,* 209 Tenn. 449, 354 S.W.2d 261, we held that an illegitimate child could not maintain an action for the wrongful death of his putative father under T.C.A. sec. 20-607 even though the father had acknowledged the child as belonging to him. In the Dilworth case it was stated that in order for the plaintiff to maintain his action that he would have to be included in the words

"to his children" as used in the statute. This case also held, again, that the statute (20-607) was in the nature of a statute of descent and distribution. To the same effect is the case of *Johnson v. Morgan,* 184 Tenn. 254, 198 S.W.2d 549.

In the case of *Henderson v. Linston, et al.,* 186 Tenn. 273, 209 S.W.2d 38, the following statement was made:— "The ordinary statute of distribution does not apply to bastards, unless they are embraced by its terms or by necessary implication." The Dilworth case by inference approved this statement. However, the Court said:—"In this connection it should be noted that the legislature by Section 31-205 has made provision for distribution of property to illegitimates from the mother, but we have no comparable statute in regard to the putative father."

The section just referred to provides that an illegitimate child of a deceased woman shall share equally in the distribution of her personal property with her legitimate children.

As stated above, the right of action shall pass "to his children or to his next of kin." The next of kin of the deceased mother are her children and they are to inherit equally from her under our law whether they be legitimate or illegitimate.

█ In the law of descent and distribution the term "next of kin" properly denotes the persons nearest of kindred to the decedent, that is, those who are most nearly related to him by blood.

"The strict legal meaning of the phrase 'next of kin' is 'next or nearest in blood.' In ascertaining who the next of kin is, the law follows the line of consanguinity.

Such is the general rule of the common law. It is the same in this state under our general statute of distribution. It is so in every case, unless there be an express statutory exemption." *Helms v. Elliott,* 89 Tenn. 446, 450, 14 S.W. 930, 931; 10 L.R.A. 535; *Tudor, et al. v. Southern Trust Co., et al.,* 193 Tenn. 331, 246 S.W.2d 33.

It would seem, therefore, that this plaintiff would be allowed to maintain this action under the above section for two reasons. One is that he is the child of the deceased and second he is her next of kin. Justice would seem to be served by permitting the maintenance of such an action because in the case of a mother there can be no doubt about the relation of the illegitimate child to her. Usually, the birth records are available to remove any doubt that the relation of mother and child exists and, of course, there can always be other proof offered of the actual birth of the child, thereby establishing the relationship beyond question. The establishment of relationship of a father to an illegitimate child is not so easy of solution.

The Court of Appeals adopted the view in this case that this statute is for the benefit of those who would be beneficiaries under the laws of descent and distribution and that since they permit an illegitimate child to share equally with legitimate children in the personal property of their mother that such illegitimate child should be permitted to sue for the wrongful death of his mother. We agree.

The case of *Haynes v. Walker,* 111 Tenn. 106, 76 S.W. 902, 903, held that under the statute for distribution of personal property among the children of an intestate that the damages recovered for the negligent killing of

the mother, there being no father, go to her children in equal parts. Such recovery becomes personal property and follows the usual distribution of personalty. *Haynes v. Walker,* supra, page 109, 76 S.W. page 905 and other cases cited.

The above holdings are also supported by *Black v. Roberts, et al.,* 172 Tenn. 20, 108 S.W.2d 1097.

Therefore, we hold expressly under the laws of the State of Tennessee that an illegitimate child may maintain an action for damages for the wrongful death of its mother and share in the proceeds thereof according to the statute of descent and distribution.

The second question presented requires this Court to consider whether there was sufficient evidence to support a verdict for the plaintiff and in doing this we are required to look at all of the evidence, construe it most strongly in favor of the plaintiff, take as true that which has a tendency to support plaintiff's right of recovery and discard all countervailing evidence, and allow all reasonable inferences to be drawn from such evidence in favor of the plaintiff. *City of Winchester v. Finchum,* 201 Tenn. 604, 301 S.W.2d 341; *Smith, et al. v. Sloan,* 189 Tenn. 368, 225 S.W.2d 539, 227 S.W.2d 2; *Rose & Co. v. Snyder,* 185 Tenn. 499, 206 S.W.2d 897 and many other cases.

In disposing of this question we find it necessary of course, to review the evidence.

Ida Henderson rented apartment No. 46 in a large building containing many other apartments from the defendants for occupancy by herself and her children, including Elizabeth Henderson. She paid a monthly rental of

$45.00 therefor which included the use of a Servel gas refrigerator and other appliances furnished with the apartment.

On the night of August 24, 1959, Ida Henderson had gone to Mississippi and had taken all of her other children and her grandchild, Anthony Henderson, leaving Elizabeth Henderson to stay in the apartment. A fifteen year old girl who lived next door spent this night in the apartment with Elizabeth Henderson and they went to bed at about 11:00 o'clock and on the following day Helen Wilkins, the young neighbor, woke up in the hospital very ill from carbon monoxide poisoning.

On the night of August 24, 1959 the wind was blowing briskly and there was a thunderstorm and rain. The doors and the windows to the apartment were closed by the occupants to keep out the wind and rain.

On the following morning, these girls did not respond to a telephone call from the father of the Wilkins girl, and upon investigation by him he found his daughter and the deceased both unconscious, one being on a bed and the other on the floor. They were taken immediately to a hospital where the Wilkins girl recovered during the day, but on that same day Elizabeth Henderson died at about 7:00 o'clock P.M.

In the special plea filed by the defendants to the declaration they "* * * admit that as a part of the premises leased to the tenants was an automatic refrigerator" (Servel gas). The answer denies that the deceased was asphyxiated as the result of gas or fumes from the refrigerator. It also denies that the same was in a defective condition at the time it was leased and thereafter. They

contend that it was under the control of the tenants. However, they do say that:

"Defendants admit that some time prior to the date of August 24, 1959, at the request of the tenants, one of the employees of the defendants did make an inspection of said refrigerator and that at the time he left the premises the refrigerator was operating properly."

There were general charges made in the declaration that the defendants were guilty of negligence in failing to properly repair the refrigerator after its defective condition had been called to the attention of the defendants through their employee Banks, who acted as the maintenance man of the apartments; in failing to properly vent and maintain the gas operating appliance furnished the tenant, Ida Henderson; in failing to ascertain the cause of the improper operation of the refrigerator; and in failing to make the proper inspection thereof in order to make proper repair.

After the death of Elizabeth Henderson an autopsy was performed on her by Dr. J. P. Francisco, a pathologist, which will be referred to hereafter. This autopsy was made on August 27, 1959. Dr. Francisco said from his examination of the hospital record on Elizabeth Henderson and from his autopsy that the primary cause of the death of Elizabeth Henderson was pneumonia and the pneumonia was caused by carbon monoxide intoxication.

 There was substantial evidence to support the finding of the jury that the deceased, Elizabeth Henderson, mother of the plaintiff, died from poisoning or asphyxiation by carbon monoxide. It is true that Dr. J. P. Francisco, who performed the autopsy, originally was of the

opinion that death was caused by broncho pneumonia. However, he stated on the trial that his first opinion was based on an erroneous belief that tests made for carbon monoxide had shown a concentration of .015 when it was actually .15. By his testimony, a concentration of .015 would cause only a headache, while a concentration of .15 would cause death.

Under thorough examination by counsel Dr. Francisco explained the symptoms and findings upon which he based his opinion and showed that the lack of certain symptoms was due to the treatment given to the deceased upon her arrival at the hospital. From the testimony of this expert and the surrounding circumstances shown in the proof, the jury was warranted in finding that carbon monoxide was the cause of death.

There is material evidence from which the jury could find and did find that the source of the carbon monoxide was the gas operated refrigerator in question. The defendants contend there is no substantial evidence of this fact, the contention being based primarily on the fact that the burner was turned off and then relighted before the test was made. Witnesses Dunn and Coolidge testified that the refrigerator was turned off as part of their check for any gas leaks in the apartment. None were found. Shortly thereafter the refrigerator was relighted and a test made for carbon monoxide which showed a reading of concentration of .15 or better.

Defendants contend that the witnesses Coolidge or Dunn may have tampered with the burner in the process of cutting it off and relighting it. There is no proof, however, that they did anything which would cause carbon monoxide. They were experts on gas and gas burning

appliances and were relied on by defendants for their testimony concerning proper adjustment of the burner. It is reasonable to assume that any "tampering" by them in the nature of adjusting the flame would cause more, not less, combustion and, therefore, less carbon monoxide.

From our reading of the proof we think there is substantial evidence to support the jury in finding that the refrigerator was the source of carbon monoxide of lethal concentration.

The question of whether there is material evidence to support a finding that the employee, Banks, was negligent in adjusting the burner or failing to adjust it properly, or failing to adjust and repair the entire refrigerator is the matter that gives us great concern.

The witness Ida Henderson, mother of the deceased, testified that when Banks came to repair the refrigerator in response to her call to the owners of the apartment, he did something underneath it. Banks testified that he went to the apartment in response to a complaint, relighted the burner and adjusted it until it had a blue flame. This was a proper adjustment according to him and the witnesses Coolidge and Dunn. Banks further testified that he was not a refrigerator expert and that he told the occupants of the apartment to report it to the office if it didn't freeze, and a refrigeration man would be sent to start it to freeze. His testimony as to his adjustment of the refrigerator is corroborated by that of the witness Dunn who inspected the refrigerator shortly after the discovey of the unconscious girls in the apartment and found that it was burning properly. This is all the testimony concerning Banks' adjustment of the burner.

The plaintiff contends that the testimony of the witness Henderson contradicts that of Banks and that her testimony was given credit by the jury as against that of Banks. The testimony of Mrs. Henderson shows that she did not know whether or not Banks relighted the burner or adjusted it properly or improperly. Therefore, it seems to us that all of the testimony indicates that Banks did properly adjust the burner and there is no evidence to support a finding to the contrary.

The expert witness Carleton testified that an improperly adjusted flame, *alone* could not produce enough carbon monoxide to cause death even if the flame was burning gas at the maximum rate. Therefore, there must have been some other reason for production of the carbon monoxide in lethal amount.

There were several possible causes of carbon monoxide mentioned in the testimony, but there is material evidence to support the conclusion that the carbon monoxide in this case was due to a blocking of the vent by lint and soot. The expert witness Dunn testified positively that the vent or flue was obstructed by such material and both he and the witness Coolidge stated that such obstruction would cause the formation of carbon monoxide.

From our examination of the record, we are convinced there is substantial evidence, sufficient to support the finding by the jury, that Elizabeth Henderson died of carbon monoxide poisoning and that the carbon monoxide was produced by the refrigerator which Banks came to adjust. It is undisputed that Banks did no more than relight it and adjust the burner. There appears to be substantial evidence to show that the production of carbon

monoxide by the refrigerator was caused by soot and lint obstructing the flue, as above indicated.

The dissenting opinion filed by a member of the Court of Appeals concludes there is no evidence in the record of negligence by Banks in adjusting the flame and relighting the burner. With this we agree. The opinion says further:—"The defendants in this case, through their agent Banks, did nothing that an ordinarily prudent man would not have done under the circumstances, nor did they omit doing anything which an ordinarily prudent man would have done under the same circumstances." This points up the determinative question in this case, that is, whether the defendants were themselves, or through their agent, negligent in some way other than making an improper adjustment of the burner. The question finally for determination is whether the defendants owed a duty to the deceased beyond that of making a proper adjustment of the burner on the refrigerator and, if so, did they breach such duty, if any. The Trial Judge charged the jury on this point as follows:

"Now, in this case it is understood that the witness, Banks, was the employee of the defendants, acting in the course and scope of his employment in doing whatever he did, and the negligent act, if any, of the witness, Banks, in connection with anything that he may have done about the operation or adjustment of this refrigerator would be the negligent acts or act of the defendants. Now, as to the duty of care owed under the law by the defendants to the plaintiff's decedent in this case, when the defendant Sneed Brothers undertook to repair or adjust the gas refrigerator in the apartment in which the plaintiff's decedent lived, the

defendants owed to the plaintiff's decedent the duty to exercise reasonable and ordinary care not to cause harm to the plaintiff's decedent. So, negligence on the part of the defendants would be a breach of that duty to exercise reasonable and ordinary care under the circumstances, and it may be an act of omission or an act of commission, failure to do something that should have been done under the circumstances or the doing of something that should not have been done under the circumstances, so when you come to pass on the negligence or absence of negligence on the part of the defendants, who are acting through their agent, you will bear in mind that definition. Repeating it, negligence is the failure to use reasonable and ordinary care under the circumstances, and reasonable and ordinary care is such care as * * * a reasonably and ordinarily prudent person would exercise under similar circumstances in the conduct of his or her own affairs.''

The Trial Court, therefore, defined the duty of the defendants as that of ordinary care, and correctly so. Ordinary care is a flexible standard which varies with circumstances. Thus though the instructions to the jury would be the same in both cases, the standard, for example, places a greater duty on one who is driving on a wet road at night in a congested area than one who is driving on an open road on a clear day. Such flexibility is the beauty of this standard.

■ Applying this rule to the facts, we find that when the defendants through their agent Banks undertook to repair the refrigerator in the apartment of the deceased they owed a duty to do that which a man exercising ordinary and reasonable care would have done under like or

similar circumstances. They also owed a duty not to omit the doing of any act which a man of ordinary care would not omit to do under the same standard.

The dissenting opinion, which is very scholarly, states: —"A landlord is liable to his tenant for injury resulting from an unsafe or dangerous condition of the leased premises if the landlord, by the exercise of reasonable care and diligence, should have known of the conditions and failed to disclose them to the tenant, but not otherwise." *Hines v. Wilcox,* 96 Tenn. 148, 33 S.W. 914, 34 L.R.A. 824, *Wilcox v. Hines,* 100 Tenn. 538, 46 S.W.297, 41 L.R.A. 278 and other cases.

In the case of *Schmalzreid v. White,* 97 Tenn. 36, 39, 36 S.W. 393, 32 L.R.A. 782 the Court said that the duty of disclosing to a tenant hidden defects or secret conditions that contribute to make the property unsafe, is not imposed upon the landlord who is ignorant of them, without fault or negligence on his part.

■ The jury in this case reached the conclusion, no doubt, that the landlord through its employee Banks knew or should have known that the gas refrigerator was not in proper working condition when the burner went out and the employee was called to relight it or to repair the refrigerator. And, therefore, such employee should have taken proper steps to thoroughly inspect the refrigerator and to restore it to a proper and safe condition; that is, safe for use to which it was normally put and safe for the occupants of the apartment who lived therein.

The defendants rely upon the Massachusetts case of *Boyle v. Cambridge Gas Light Company,* 331 Mass. 56,

117 N.E.2d 150 to support their position. The dissenting opinion also relied upon this case. The facts are similar but three items point out a clear distinction. First, there was a much longer lapse of time between the repair and the injury in that case. Second, several possible causes were shown for the formation of the carbon monoxide, none more probable than the other. Third, and most important, the repair to the refrigerator in that case was accomplished by skilled persons, gas company employees, who not only adjusted the burner but also cleaned the vent and made a thorough inspection. When they approved that refrigerator for use it would seem that all that could be done had been done by the landlord under those circumstances. In the instant case, of course, the vent was not cleaned and the only thing done by the employee was to relight the burner.

Banks stated that he had been working for the defendants for seven or eight years and that he served as the maintenance man for the apartments. One of the defendants directed Banks to go to apartment No. 46 in answer to a complaint by Ida Henderson that the refrigerator was not working properly. He was asked on direct-examination:

"Q. Now, when you got there, Herman, what did you find, if anything, wrong with that freezer?

"A. When I got there, the box wasn't burning. I lit it and adjusted the burners on it, and she said it wasn't freezing, and I told her to keep the door closed and if it didn't freeze, to report it to the office and I would get a refrigeration man to start it to freeze."

He said that he adjusted the burner properly and there was nothing else wrong with the refrigerator when he left that he knew anything about.

He was asked:—"You know, of course, that gas is dangerous, don't you?" Answer. "Yes, sir."

The proof shows that the tenant called one of the defendants and advised him that the refrigerator was not in proper working condition. In response to this call the maintenance man of the apartments was sent to make the proper adjustments or repairs to the gas refrigerator. It was admitted that he was not a skilled refrigerator repairman. He did say to the occupants of the apartment, however, that he had adjusted the burner properly but that if it didn't freeze properly that the tenant should notify the office and he, Banks, would get a refrigeration man to start it to freeze. This adjustment occurred a few days before the death of Elizabeth Henderson.

The assignments of error here, are that the Court of Appeals erred in overruling the assignments there, to the effect that (1) there was no evidence to support the verdict, and (2) the Court erred in overruling the defendants' general motion for a directed verdict made at the conclusion of all the evidence for the reason more specifically set out in said motion.

We have read very carefully the record in this case and have considered all the assignments of error and we find them to be without merit.

Therefore, the reasons herein set out the action of the Court of Appeals is in all things affirmed.

HOLMES, JUSTICE, not participating.