**MARSHALLS OF NASHVILLE,
TENNESSEE, INC.,
Plaintiff/Appellant,**

v.

**HARDING MALL ASSOCIATES, LTD.,
Defendant/Appellee.**

Court of Appeals of Tennessee,
Western Section,
at Nashville.

June 8, 1990.

Application for Permission to Appeal
Denied by Supreme Court
Oct. 1, 1990.

Lew Conner Boult, Cummings, Conners & Berry, George E. Copple, Jr., Nashville, for plaintiff/appellant.

Barry L. Howard and Alan M. Sowell, Gracey, Ruth, Howard, Tate & Sowell, Nashville, for defendant/appellee.

TOMLIN, Presiding Judge, (W.S.)

Marshalls of Nashville, Tennessee, Inc. (hereafter "Plaintiff") filed suit in the Chancery Court for Davidson County against Harding Mall Associates (hereafter "Defendant") for damages resulting to Plaintiff's premises and merchandise. Plaintiff leased its premises from Defendant and contends that the damages it sustained resulted from Defendant's alleged breach of lease and tortious conduct. Following a bench trial, the chancellor found for Defendant and dismissed Plaintiff's complaint. Plaintiff contends on appeal that the chancellor erred in dismissing its complaint. We find no error and affirm.

Plaintiff became a tenant in the Harding Mall Shopping Center owned by Defendant in 1983 when it took over the space occupied by Service Merchandise, assuming its lease. The lease was duly assigned to Plaintiff with the consent of Defendant. Plaintiff began to experience roof leaks almost immediately after it became Defendant's tenant. These leaks continued over a two-year period. Defendant undertook to repair the roof in certain areas from time to time. In addition, Defendant installed a system of channels between the structural roof and the suspended ceiling in Plaintiff's store in order to catch the water as it leaked through the roof. This water was diverted into a catch basin and ultimately removed.

Plaintiff initially filed suit against Defendant in December, 1985, alleging a breach of Article 16, the "Quiet Enjoyment" provision of the lease, contending that Defendant had failed to keep the roof in good repair as required by Article 4 of said lease. In addition, Plaintiff sought a declaratory judgment against Defendant that would require Defendant to replace the roof. At the same time, Plaintiff began paying its rent owed to Defendant under the lease into the Registry of the Chancery Court. Defendant counter-claimed for damages, alleging that any defects or deficiencies in the roof were caused by the Plaintiff's negligent installation of two roof-top air conditioning units. Plaintiff filed a supplemental complaint alleging that it had suffered additional damages from continuing roof leaks.

In April, 1986, Defendant filed a motion seeking to have the funds on deposit with the court released or a limitation placed on the funds deposited in the court. Before a hearing could be held on the motion, the parties entered into a settlement agreement referred to as the "Mutual Release Agreement" (hereafter "MRA") on June 18, 1986. The MRA provided that the parties agreed to release each other from any and all claims, liabilities and causes of action alleged by either party in the original action filed by Plaintiff. Defendant was committed to replacing the roof according to specifications set forth in a proposal by ENCON Roofing Consultants "by contract with a licensed, bonded, and responsible roofer chosen by defendant but acceptable to plaintiff." Under the terms of the MRA, Plaintiff and Defendant were to share the cost of replacing the roof, with Defendant paying sixty percent and Plaintiff forty percent. The MRA provided that Plaintiff was to recover its forty-percent

contribution toward the replacement of the roof when Harding Mall was sold by Defendant or its successor.

Defendant recommended to Plaintiff that Richard Boyanton, d/b/a RGM Enterprises (hereafter "Boyanton"), a roofing contractor, be employed to replace the roof. Defendant's attorney, Joel Leeman, contacted Lee Davies, Plaintiff's attorney, for the purpose of obtaining Plaintiff's approval of Boyanton. Leeman advised Davies that Boyanton had performed satisfactory work for Defendant in the past. Davies passed this information on to Plaintiff. Without checking his available references, Plaintiff approved Boyanton as the roofing contractor. Although not clearly stated in the record, it appears that the requirement that Boyanton be bonded was waived. Defendant thereupon entered into a contract with Boyanton to replace the roof. As such, Boyanton functioned as an independent contractor on the job. Plaintiff employed John Downs, d/b/a ENCON Roofing Consultants, (hereafter "Downs") to monitor Boyanton's work.

Replacement of the roof began on or about June 23, 1986. On that same day Downs visited the site and inspected Boyanton's work. He discovered that Boyanton was not installing the new roof in a workmanlike manner, nor was the installation being done in accordance with standard roofing practices. Downs' inspection revealed several deficiencies in Boyanton's work, which he reported to the appropriate parties, to-wit: (1) The loose gravel that had been removed from the roof was piled up in such a manner as to create the danger of a roof cave-in; (2) there was insufficient roofing equipment on the job site to carry out the work required; (3) the roofing material stored on the site was not stored in a proper fashion to protect it from moisture; (4) materials dumped on the ground created a safety hazard; (5) there was no firefighting equipment on the job site; (6) the roofing felts were installed in an unacceptable manner and did not conform to standard roofing procedures; (7) there was a failure to put asphalt coating on the felts installed; and (8) the tie-in of the new roof to the existing roof was inadequate and was not leak-proof. When questioned by Downs about the potential for leaks in the area under repair, Boyanton responded "don't worry about it, we'll take care of it." Downs immediately contacted Davies and advised him of the deficiencies. Davies in turn informed Leeman by telephone. According to Davies, the conversation with Leeman was to the effect that Plaintiff was overly concerned with the roofing project, and if there were any problems they would be corrected. Leeman, however, testified that he did not recall advising Davies that Plaintiff was overreacting.

A rainstorm of some proportions occurred on the night of June 23, 1986. As a result, water entered Plaintiff's store through the portion of the roof that was being repaired by Boyanton, damaging the interior of Plaintiff's store, including its merchandise. Plaintiff subsequently filed a second supplemental complaint in January, 1987 for damages sustained as a result of the June 23rd incident. That complaint alleged that Defendant breached "Article 4 Repairs" of the lease by failing to keep the roof in good order and repair at its own cost and expense, and that such failure to keep the roof in good repair interrupted Plaintiff's quiet enjoyment of the leased premises in violation of "Article 16 Quiet Enjoyment." In addition, Plaintiff alleged that Defendant had made negligent misrepresentations as to Boyanton's abilities, that it was negligent in selecting an incompetent independent contractor, and was thus vicariously liable upon the theory that the work to be performed by Boyanton was inherently dangerous to Plaintiff.

In March, 1987, the chancellor entered an agreed order which referred to a second Mutual Release Agreement dated July 25, 1986. That order provided that certain claims had been compromised and settled, and that the causes of action alleged by Plaintiff in its initial complaint and the first supplemental complaint, and the causes of action set forth by Defendant in its counter-claim should be dismissed with prejudice. The order specifically provided that "[i]n accordance with the agreements be-

tween these parties, said dismissal shall in no way affect ... those causes of action asserted on behalf of the Plaintiff in its 'Second Supplemental Complaint'...."

At the conclusion of the trial below, the chancellor made the following oral findings from the bench:

I'm finding in favor of the Defendant, and I'll state my findings and conclusions.

The case begins, of course, with the lease. That's the contract that the parties executed and which they intended to and does govern the relationship in this case. The parties became embroiled in a dispute over the lease and the terms of the lease, and that dispute had to do with the claim on the part of the tenant, that the landlord was not living up to its obligation under the lease. They settled that dispute with what they called a mutual release agreement, and the work then proceeded under that agreement and the roofer was hired by the landlord under the agreement. The roof was, the work was performed negligently and the tenant has been damaged.

The lease does govern the relationship between the parties, but it's important to note that this work that was being done by the roofer was being done not pursuant to the lease, but pursuant to the mutual release agreement, and the mutual release agreement released the landlord from the liability under the lease. That's what a release is. The parties had a lawsuit, had a case in which the tenants said that the landlord was not living up to its obligations, and the landlord denied it and said that the tenants had caused the problem. And the parties settled it by substituting a new agreement and the new agreement provided for the work to be done by this independent contractor. And that's the contract that governs this matter, not the lease. There's no evidence of any negligence on the part of the landlord from selecting the roofer. No misrepresentations were made. The roofer is an independent contractor who performed the work pursuant to the release, mutual release agreement.

The case really seems to be an effort on the part of the tenant to get judicially what it wishes it had done to begin with, and that is not settle the first case with the release agreement that it did, and not approve this roofer, which it did. But the simple fact is, it chose to settle the dispute with the landlord over the leaky roof this way and release the landlord of its obligation under that clause in the contract, that's what a release is, and then approve the hiring of this tenant, this roofer, apparently knowing very little about the roofer.

And under these facts, I just don't find any liability at all for, on behalf of the landlord.

## I. THE TORT CLAIMS

It is contended on appeal by Plaintiff that the chancellor erred in dismissing its tort claims based upon the theories of negligent misrepresentation, negligence in the selection of an incompetent independent contractor, and vicarious liability on the basis that the work to be performed by the independent contractor was inherently dangerous to Plaintiff.

### A. Negligent Misrepresentation

■ The courts of this state recognize an action in tort for negligent misrepresentation by "[o]ne who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions." The supplier of false information is subject to liability for pecuniary loss where the receiver of such false information justifiably relies on such information. See *Tartera v. Palumbo*, 224 Tenn. 262, 453 S.W.2d 780 (1970).

■ As to the representations made to Plaintiff concerning Boyanton's abilities, the record reflects only those made by Leeman, Defendant's attorney. Davies, Plaintiff's attorney, stated that he was contacted by Leeman and advised that Boyanton had previously done work for Defendant and had done "a very good job." There is no evidence in this record that this state-

ment by Leeman was false. To the contrary, an employee of Defendant testified that he had previously observed Boyanton's roofing work for Defendant and that the work had been performed satisfactorily. The chancellor did not err in finding that Defendant was not guilty of negligent misrepresentation.

### B. Negligence in Selecting An Independent Contractor

■ Plaintiff's next contention is that Defendant was guilty of negligence in hiring an incompetent roofing contractor to perform the work. We disagree. This is one of the many exceptions to the general rule that an employer will not be held liable for the acts of an independent contractor. This exception has been long recognized in this state. See *Mooney v. Stainless, Inc.*, 338 F.2d 127 (6th Cir.1964); *Jolly Motor Livery Corp. v. Allenberg*, 188 Tenn. 452, 221 S.W.2d 513 (1949); *Cash v. Casey–Hedges Co.*, 139 Tenn. 179, 201 S.W. 347 (1918); *Powell v. Virginia Construction Co.*, 88 Tenn. 692, 13 S.W. 691 (1890).

■ For one to be held liable for negligence in the hiring of an independent contractor based upon the theory of the contractor's incompetence, it must be shown that the employer either knew, or by the exercise of reasonable care might have ascertained, that the independent contractor was not qualified to perform the work for which he was contracted. *Mooney v. Stainless, Inc.*, 338 F.2d at 131. The fact that the independent contractor so employed commits an act of negligence in performing the job for which he was hired raises no presumption that the employer was negligent in hiring him in the first place. *Id.* The burden is on the Plaintiff to show a breach of duty. *Id.*

■ Rick Forte, an employee of Defendant, testified that he worked with Boyanton in 1985 in connection with a mall owned by Defendant in Mississippi. Through a bidding process, Boyanton was awarded a roofing contract on Defendant's mall. Forte testified that he visited the mall in Mississippi while Boyanton was working there and actually went up on the roof to observe his work. According to Forte, there were no problems with the work as performed by Boyanton, who completed the work "satisfactorily." Based upon this, Forte recommended Boyanton to Leeman.

Under the terms and provisions of the MRA, Plaintiff had the right to reject Boyanton. Defendant furnished Plaintiff with several references for Boyanton. Plaintiff never contacted the references prior to notifying Defendant of Boyanton's acceptability.

### C. Vicarious Liability—Inherently Dangerous Work

■ Finally, Plaintiff contends that inasmuch as Defendant hired Boyanton to perform an inherently dangerous job—that of re-roofing Plaintiff's store—Defendant could not contract away its duty of due care, and therefore, any injury resulting to Plaintiff from the performance of that contract would render Defendant liable. In *Cooper v. Metropolitan Government, Etc.*, 628 S.W.2d 30 (Tenn.App.1981), the Middle Section of this Court stated:

As an exception to the general rule of nonliability of an employer for the torts of an independent contractor, an employer is liable or cannot escape liability for injuries caused by the failure of an independent contractor to exercise due care in the performance of work which is inherently or intrinsically dangerous. Under this exception, the owner or contractee is responsible for injuries to a third person caused by work done by an independent contractor, where the contract directly requires the performance of work inherently or intrinsically dangerous, however skillfully done. The theory upon which this liability is based is that a person who engages a contractor to do work of an inherently dangerous character remains subject to an absolute, nondelegable duty to see that it is performed with that degree of care which is appropriate to the circumstances, or in other words, to see that all reasonable precautions shall be taken during its performance, to the end that third persons may be effectually protected against injury.

*Id.* at 32. The Court also pointed out that in order to find that the work to be performed by the independent contractor was intrinsically or inherently dangerous, "the danger must be involved in the performance of the contract and must result directly from the work to be done and not from the collateral negligence of the contractor." *Id.*

*Prosser & Keeton on the Law of Torts* § 71, at 515 (5th ed. 1984) describes collateral negligence as "negligence in the operative details of the work, easily controlled by the contractor, and not ordinarily considered or contemplated by the employer, as distinguished from its general objective or plan, which must necessarily be so contemplated." At page 516 of *Prosser & Keeton on the Law of Torts*, it is stated that:

> The essence of "collateral" negligence, therefore, appears to be, not its character as a minor incident or operative detail of the work to be done, but rather its disassociation from any inherent or contemplated special risk which may be expected to be created by the work. The employer is not liable because the negligence is "collateral" to the risk created— which is to say, that the performance of the work contracted for in the normal manner contemplated by the contract would involve no reasonable expectation of such a risk of harm to the plaintiff, and it is the abnormal departure from usual or contemplated methods by the servants of the contractor which has created the danger.

In our opinion, the work carried out by Boyanton in replacing the roof on Defendant's mall above Plaintiff's premises was not in and of itself intrinsically or inherently dangerous to Plaintiff and to its merchandise and fixtures in the area immediately below. According to Downs, Plaintiff's roof consultant, the leaking occurred because Boyanton installed the tie-ins improperly and failed to mop off the felts. Downs testified that Boyanton failed to make the tie-ins leakproof. Downs also stated that Boyanton used sheets of Visquene, a type of polyethylene material, to cover the area in question, a method which Downs labeled "unacceptable."

The damage to Plaintiff's property was caused by collateral negligence on the part of Boyanton relating to details of the work which reasonably was not to have been expected by Defendant. Under the facts and circumstances of this case, it cannot be said that the repairing of the roof was so intrinsically or inherently dangerous as to hold Defendant liable for the acts of Boyanton.

## II. BREACH OF THE LEASE

Plaintiff contends that Defendant breached the lease agreement by failing to maintain the roof as required by the "Article 4 Repairs" provision, thereby interfering with Plaintiff's quiet enjoyment in violation of the "Article 16 Quiet Enjoyment" provision of the lease. On the other hand, Defendant contends that the MRA modified the lease and abrogated Articles 4 and 16 of the lease agreement. In the alternative, Defendant contends that even if the quiet enjoyment provision of the lease was still in full force and effect while Boyanton was repairing the roof, Defendant did not breach it.

In concluding that Defendant was not liable for breach of the lease, the trial court reasoned that the repairs being carried out by Boyanton were performed pursuant to the MRA, which released Defendant from any liability under the lease. We respectfully disagree with the trial court's finding that the MRA released Defendant from any liability under the lease. However, we concur with the trial court's finding that Defendant was not in breach of the lease. Even if the trial court reaches the right result on the wrong grounds, the appellate court can affirm the trial court's judgment. *Hopkins v. Hopkins*, 572 S.W.2d 639 (Tenn.1978); *Owen v. Stanley*, 739 S.W.2d 782 (Tenn.App.1987); *Bohlinger v. American Credit Co.*, 594 S.W.2d 710 (Tenn.App.1979).

Prior to the MRA's execution, Plaintiff contended that Defendant was obligated to repair the roof because "Article 4 Repairs" provided that "[l]andlord, at its own cost

and expense, shall ... keep in good order and repair ... the roof." On the other hand, Defendant contended that Plaintiff was responsible for the leaks in the roof because of its negligent installation of two roof-top air conditioning units. The MRA merely settled the dispute between the parties as to who was liable for the roof repairs, providing, among other things, that the cost of repairing the roof would be shared by Defendant and Plaintiff in a sixty/forty ratio. It did not modify, supersede, or abrogate the lease provisions.

█ In contending that Defendant breached the "Repairs" provision of its lease with Plaintiff, Plaintiff relies on the specific language to the effect that "[l]andlord, at its own cost and expense, shall ... *keep in good order* and repair ... the roof." [emphasis ours] We find this contention to be without merit. A breach of a lease provision such as this is committed only after a tenant notifies its landlord that a portion of the leased premises is in need of repair, and the landlord timely fails to respond and bring about such repairs. This is not the factual situation before us. Here the damage resulted to Plaintiff's property at a time when Defendant, through an independent contractor, was attempting to bring about repairs to the roof.

█ It is also Plaintiff's contention that by virtue of Defendant's failure to keep the roof in good repair, Defendant interrupted Plaintiff's quiet enjoyment of the leased premises, which would be in violation of Article 16 "Quiet Enjoyment" of the lease. Article 16 provides:

Landlord covenants that tenant shall quietly hold, occupy and enjoy the demised premises without hindrance, ejection or molestation by Landlord.

The issue for our determination is whether or not a lessor can be held liable for breaching such a covenant when an independent contractor hired by it negligently repaired the leased premises in such a manner as to interfere with a lessee's quiet enjoyment of the premises.

The test for determining a landlord's liability for breach of the covenant of quiet enjoyment under such circumstances is found in 49 Am.Jur.2d *Landlord and Tenant* § 343 (1970). The test is "whether or not the independent contractor might have performed the contract with the lessor without ... interfering with the lessee's enjoyment thereof. If he could have done so, then the landlord is not liable." *Id.* at 358.

This test was applied by the Colorado Supreme Court in *Western Stock Center, Inc. v. Sevit, Inc.*, 195 Colo. 372, 578 P.2d 1045 (1978). In *Western Stock*, the landlord contracted with an independent contractor for the removal of various ammonia pipes, valves and fittings from its building. The work was to be performed on some of the upper floors. The tenant, who was ultimately damaged as a result of the independent contractor's negligent use of an electric cutting torch, occupied space on the ground floor. A fire occurred, destroying the entire building. The tenant filed suit against the landlord, independent contractor, and others, seeking compensation for property damage. Only the tenant's claim against the landlord went to trial.

The court in *Western Stock* concluded that "[s]ince [the independent contractor] could have performed the pipe salvage work without interfering with [the tenant's] enjoyment of the leased premises, [the landlord] cannot ordinarily be held liable for breach of the covenant of quiet enjoyment." *Id.* 578 P.2d at 1051. The court further pointed out that since the independent contractor could have performed the work without interfering with the tenant's possessory rights, the landlord could be found liable only for breaching the covenant of quiet enjoyment if it is found to have been "negligent in selecting an incompetent or careless independent contractor who performed the work in such a manner as to result in interference with the peaceful enjoyment of [the tenant's] leased premises." *Id.*

In the case under consideration, there is no question that the independent roofing contractor could have replaced the roof above Plaintiff's leased premises without interfering with Plaintiff's quiet enjoyment thereof had he not been guilty of collateral

negligence in the manner in which the work was carried out. Inasmuch as we have already determined and held that under the record before us Defendant was not guilty in the selection of Boyanton as an independent contractor, it follows that Defendant cannot be held liable to Plaintiff for breach of the covenant of quiet enjoyment on the theory that it was negligent in selecting Boyanton as the independent contractor.

Accordingly, the decree of the chancellor is affirmed. Costs in this cause are taxed to Plaintiff, for which execution may issue if necessary.

CRAWFORD and FARMER, JJ., concur.