Leslie Quimby [ALLEN]

v.

William E. SULCER, et al.

Court of Appeals of Tennessee,
at Nashville.

May 30, 2007 Session.

Aug. 27, 2007.

Application for Permission to Appeal
Denied by Supreme Court
Jan. 28, 2008.

---

David L. Cooper, Nashville, Tennessee, for the appellant, Leslie Quimby Allen.

Michael D. Cox, Columbia, Tennessee, for the appellees, William E. Sulcer, individually, William E. Sulcer and Ella Will Sulcer, Trustees for and Lifetime Beneficiaries of the Sulcer Family Trust, and Sulcer Family Trust.

## OPINION

DAVID R. FARMER, J., delivered the opinion of the court, in which HOLLY M. KIRBY, J. and DONALD P. HARRIS, SR. J., joined.

This is a negligence action. A landlord instructed his tenant to prune large limbs from a tree on the rental property with a chainsaw. The tenant's eighteen year old daughter was assisting by clearing the limb debris and sustained severe internal injuries from a falling limb. The daughter instituted this negligence action against the landlord, relying on theories of the landlord's negligence and vicarious liability. The trial court granted summary judgment for the defendant landlord. Finding that the defendant did not carry

his burden on the issue of the duty to select a competent contractor, we reverse and remand.

The facts of this case are largely undisputed. On December 28, 2002, Leslie Quimby Allen (Ms. Allen)[1], the then-eighteen year old daughter of Ron and Alfreda Quimby (Mr. Quimby, Ms. Quimby, or the Quimbys), sustained an aortic valve rupture and other internal injuries that required emergency open-heart surgery at Vanderbilt University Medical Hospital. Her internal injuries resulted from the impact of a tree limb that had fallen and ricocheted off the ground, striking Ms. Allen in the chest and chin. At the time of the incident, Mr. Quimby, a commercial truck driver, was in an ash tree (approximately 15 to 20 feet off the ground) in front of his rental house, pruning overgrown limbs with a chainsaw. Ms. Allen was standing in front of the house and assisting her father by clearing the limb debris. When her mother found her after the accident, Ms. Allen was not positioned directly under the tree.

Mr. Quimby had previously requested that Mr. William E. Sulcer (Mr. Sulcer), his landlord who lived 100 yards from the rental house, have the tree pruned. According to Ms. Allen, her father had had at least two previous discussions with Mr. Sulcer about the tree. Mr. Quimby voiced to Mr. Sulcer his concern that the overgrown limbs, hanging over the house and driveway, would hurt someone. Ms. Allen said her father

> just went up [to Mr. Sulcer's house] and told him about the branches because they were bad.
>
> . . . .

---

[1] Ms. Allen was not yet married at the time she instituted this action. Although the caption names the plaintiff as "Leslie Quimby," we shall refer to her by her current, married name, Leslie Quimby Allen, or Ms. Allen.

And Mr. Sulcer had said that—he said, no, I'll get somebody out here; I'll get somebody out here. At first, he said, can I do it; and—or can my dad, Ron Quimby, do it. He said, no, I don't like heights; I don't like doing it—and all of this. So then he said, I'll get somebody out there; I'll get somebody out there. So then one day Mr. Sulcer comes to our door.

Mr. Sulcer appeared at the door, asked Mr. Quimby to come outside, and pointed to the branches that needed pruning to accommodate the raised bed of a dump truck. Mr. Sulcer was planning to resurface the access road in front of the Quimby's house with gravel because it had fallen into disrepair, resulting in Mr. Quimby's truck getting stuck in mud three weeks before. Mr. Sulcer identified the limbs he wanted cut, which included the 25- to 30-foot long limb (with a diameter of 12 to 14 inches) that injured Ms. Allen. In his deposition, he described the limb as a "big one." According to Ms. Allen, even though Mr. Sulcer had used professional tree services on his farm in the past, Mr. Quimby agreed to perform the work because he was tired of the limbs hanging over the house and driveway. Mr. Sulcer did not offer to compensate Mr. Quimby for his services.

Mr. Quimby had no training or expertise in pruning or felling trees, or with operating chainsaws, even though he owned one and used it on the limb in question. Mr. Sulcer knew Mr. Quimby did not have experience pruning trees but relied on the fact that Mr. Quimby had cut limbs on the property before with no problems. Even so, Mr. Quimby had never before trimmed large limbs or climbed into a tree to do so.

Other than selecting the limbs, Mr. Sulcer provided no other instruction to Mr. Quimby. He gave no equipment to Mr. Quimby and was not present at the time of the injury.

At the time of the incident, Ms. Allen was eighteen years old and lived in her parents' home with her two-year old daughter. The only instructions Ms. Allen remembered receiving were those of Mr. Quimby, cautioning her to "stay back." The record contains very little information about where Ms. Allen was standing when the limb struck her. It only reveals that the limb fell to the ground and bounced up to hit her; that Ms. Allen was not located directly under the tree when her mother found her after the injury; and that Ms. Allen had been standing "to the left of Mr. Quimby and . . . behind the tree" or "not on the side of the driveway, [but] on the side of the house."

Ms. Allen filed a complaint against Mr. Sulcer [2] on December 22, 2003, alleging the negligence of Mr. Sulcer as landlord and as the principal of a negligent agent, Mr. Quimby. With respect to Mr. Sulcer's negligence, Ms. Allen asserted that Mr. Sulcer was negligent in instructing her father to undertake such a task and in failing to supervise his activities. Moreover, she contended Mr. Sulcer was negligent in failing to maintain the leased premises in a safe condition. She also contended that the negligence of her father should be imputed to Mr. Sulcer under the principles of vicarious liability.

Mr. Sulcer answered and denied the allegations of his negligence, specifically averring that Ms. Allen was negligent; that Mr. Quimby's failure to warn Ms. Allen and to keep her away from the area

**2.** In addition to naming Mr. Sulcer individually as a defendant, Ms. Allen included the following parties in her complaint: William E. Sulcer and Ella Will Sulcer, Trustees and Lifetime Beneficiaries of the Sulcer Family Trust; and the Sulcer Family Trust.

constituted an intervening act and the proximate cause of her injuries; that Mr. Sulcer owed no duty of care to Ms. Allen; and that there was no agency relationship between Mr. Sulcer and Mr. Quimby. Mr. Sulcer averred in the alternative that if there were any relationship between Mr. Quimby and Mr. Sulcer, it was that of employer and independent contractor. Mr. Sulcer filed a motion for summary judgment, three affidavits, and a statement of undisputed facts and first contended that he did not create the alleged dangerous condition and that, if it existed, he had no duty to Ms. Allen because the dangerous condition was known (or should have been known) to her. The motion next addressed Ms. Allen's vicarious liability claim. Mr. Sulcer asserted that there was no relationship between himself and Mr. Quimby, but, if there were, it could only be that of employer and independent contractor. He argued that, as an employer of an independent contractor, he was not liable for the negligent acts of that individual. Finally, Mr. Sulcer relied upon comparative fault and contended that Ms. Allen was 50% or more at fault for her injuries.

After Mr. Sulcer filed the answer and a motion for summary judgment, Ms. Allen filed a motion to amend the complaint to include the independent contractor relationship and to specify that Mr. Sulcer was negligent in failing to employ a professional tree service. She had also filed the affidavit of her mother, the depositions of Mr. Sulcer and herself, and a report compiled by a certified arborist. Soon thereafter, she filed a response to Mr. Sulcer's statement of undisputed facts along with her statement of undisputed facts. Between the two statements of undisputed facts, the only disputed points involved Ms. Allen's contentions based upon the report of her certified arborist.[3] With his response to Ms. Allen's statement of undisputed facts, Mr. Sulcer also filed a motion to strike the arborist's report.

The trial court heard argument on May 6, 2006, and granted summary judgment in favor of Mr. Sulcer. The court specifically found Mr. Quimby to be an independent contractor. The parties do not dispute this finding on appeal. In a memorandum opinion, the court noted that

[t]he theory of collateral negligence is a factor to consider. The facts [of] this case are on all fours with the example given by the Restatement (Second) of Torts, Section 427.

. . . . Ron Quimby had the plaintiff picking up the branches while [he] was cutting the branches. . . . Ron Quimby's collateral negligence created a new risk by having his daughter help him. . . .

It is a well settled principle of law that employers of an independent contractor owe no duty to the employees or "helper" of the independent contractor engaged in an inherently dangerous activity.

The plaintiff's claims fail as a matter of law. The undisputed facts establish that Ron Quimby was an independent contractor and the defendants are not liable for any negligence of Mr. Quimby. The defendant[ ]s had no duty to the plaintiff because they did not exercise any control over Mr. Quimby or his employee, the plaintiff.

The court entered an order on May 23, 2006, adopting verbatim the memorandum

---

3. The facts submitted by Ms. Allen, now disputed, included allegations that Mr. Quimby failed to comply with ANSI standards, that the cost of a professional tree trimmer would have been $300 to $500, that a career in tree trimming of this type is one of the most dangerous occupations in the country, and that the expertise required for safe limb removal far exceeded Mr. Quimby's qualifications.

opinion previously issued and filed. It never expressly ruled on Ms. Allen's motion for leave to amend the complaint or on Mr. Sulcer's motion to strike the report of Ms. Allen's certified arborist.

### Issues Presented and Standard of Review

On appeal, Ms. Allen presents the following issues for review:

(1) Whether the trial court erred in granting summary judgment to the Appellees pursuant to Rule 56 of the Tennessee Rules of Civil Procedure based on the Appellant's claims of negligence as to the actions of Appellee William Sulcer when he instructed Ron Quimby, an independent contractor, to trim large tree limbs on his property that ultimately caused serious personal injury to the Appellant; and

(2) Whether the trial court erred in granting summary judgment based principally on the "collateral negligence" doctrine in the Restatement (Second) of Torts as to the claims of vicarious liability against Appellee William Sulcer regarding his nondelegable duty to exercise reasonable care to prevent harm to others when he instructed Ron Quimby, an independent contractor, to trim large tree limbs on his property that ultimately caused serious personal injury to the Appellant.

Summary judgment is proper where the resolution of legal issues will dispose of the case. *See Fruge v. Doe,* 952 S.W.2d 408, 410 (Tenn.1997); *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn.1993); *Pendleton v. Mills,* 73 S.W.3d 115, 121 (Tenn.Ct.App.2001). This Court reviews awards of summary judgment *de novo* with no presumption of correctness. *BellSouth Adver. & Publ'g Co. v. Johnson,* 100 S.W.3d 202, 205 (Tenn.

2003); *Scott v. Ashland Healthcare Ctr., Inc.,* 49 S.W.3d 281, 285 (Tenn.2001). This standard requires an independent determination of whether the requirements of Tennessee Rule of Civil Procedure 56 have been satisfied. *Hunter v. Brown,* 955 S.W.2d 49, 50–51 (Tenn.1997). As stated in Tennessee Rule of Civil Procedure 56.04, summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. Courts must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn. 2002); *Doe v. HCA Health Servs. of Tenn., Inc.,* 46 S.W.3d 191, 196 (Tenn.2001). Thus, when undisputed facts and reasonably drawn inferences support only one conclusion—that the moving party is entitled to a judgment as matter of law—an award of summary judgment is appropriate. *Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d 614, 620 (Tenn.2002); *Webber v. State Farm Mut. Auto. Ins. Co.,* 49 S.W.3d 265, 269 (Tenn.2001); *Clifford v. Crye–Leike Commercial, Inc.,* 213 S.W.3d 849, 852 (Tenn.Ct.App.2006).

The moving party bears the burden of establishing the absence of genuine issues as to material facts as well as its entitlement to a judgment as a matter of law. *Godfrey,* 90 S.W.3d at 695; *Shadrick v. Coker,* 963 S.W.2d 726, 731 (Tenn.1998). For a defendant to secure an award of summary judgment, it must affirmatively negate an essential element of the nonmoving party's claim or establish an affirmative defense that conclusively defeats the nonmoving party's claim. *Byrd,* 847 S.W.2d at 215 n. 5; *Cherry v. Williams,* 36

S.W.3d 78, 82–83 (Tenn.Ct.App.2000). If the defendant succeeds in making this showing, the burden then shifts to the plaintiff to bring forth evidence showing a genuine issue of material fact. *Tate v. Champion,* No. E2006–01033–COA–R3–CV, 2007 WL 1259208, at *6 (Tenn.Ct.App. Apr.30, 2007)(*no perm. app. filed* ).

### *Analysis*

■ A successful negligence claim requires the plaintiff to establish the following: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate cause. *Staples v. CBL & Assoc., Inc.,* 15 S.W.3d 83, 89 (Tenn.2000). Although the parties agree that Mr. Quimby acted as an independent contractor on behalf of Mr. Sulcer and focus most of their arguments on vicarious liability, the facts of this case more directly implicate landlord/tenant law rather than the law of agency. The trial court ruled that Mr. Sulcer owed no duty to her because Mr. Quimby was an independent contractor guilty of collateral negligence. The trial court overlooked the fact, however, that Ms. Allen was a tenant of Mr. Sulcer and failed to account for the possibility of Mr. Sulcer's negligence as a landlord. Thus, the dispositive question is whether Ms. Allen encountered a harm whose foreseeability gave rise to a duty of reasonable care on the part of Mr. Sulcer, the landlord, to protect her from the danger of falling limbs.

■ In general, landlords owe a duty of reasonable care to their tenants. *See, e.g., Jolly Motor Livery Corp. v. Allenberg,* 188 Tenn. 452, 221 S.W.2d 513, 515 (1949); *Tate,* 2007 WL 1259208, at *3; *Arzanzarrin v. Johnstown Properties, Inc.,* No. 01–A–01–9406–CV00259, 1994 WL 672675, at *3 (Tenn.Ct.App. Dec.2, 1994). When a landlord undertakes to repair or maintain some part of the premises, he owes his tenants a duty to exercise ordinary and reasonable care in seeing the repairs are properly made. *Sneed v. Henderson,* 211 Tenn. at 585–86, 366 S.W.2d 758 (Tenn. 1963); *Jolly Motor Livery Corp.,* 188 Tenn. 452, 221 S.W.2d 513, 515 (1949). Regarding this duty, the Tennessee Supreme Court has opined that

> [a] landlord is not an insurer of the safety of the leased premises. A landlord is liable only for injury arising from a failure to act with the degree of forethought and intelligence that characterizes the conduct of prudent men in general.

*Jolly Motor Livery Corp.,* 221 S.W.2d at 515 (citations omitted). For example, in *Sneed v. Henderson,* the Tennessee Supreme Court found the lessor negligent when, in response to a tenant's complaint, he sent an employee unskilled in refrigerator repair to tend to a gas operated refrigerator. *Sneed,* at 585–88, 366 S.W.2d 758. The maintenance man did no more than relight the burner, and the tenant succumbed to carbon monoxide poisoning only days later. *Id.* at 588, 366 S.W.2d 758. The court noted that there was no indication that the maintenance man had been negligent in how he relit the burner. *Id.* at 584, 366 S.W.2d 758. Rather, the omission of a thorough inspection of the unit had resulted in the tenant's death. *Id.* at 586, 366 S.W.2d 758. The lessor, therefore, had breached the duty of reasonable care by sending an unskilled employee to adjust the refrigerator. *See id.* at 588, 366 S.W.2d 758.

In the unreported case of *Arzanzarrin v. Johnstown Properties, Inc.,* this Court found that the landlord of an apartment complex had breached the duty of care with respect to a more obvious danger

than the one posed in *Sneed*. *See Arzan-zarrin*, 1994 WL 672675, at *3–4. There, the landlord had engaged a roofer to replace the roof of the building. *Id.* at *1. This effort was underway when inclement weather forced the roofer to suspend his work temporarily. *Id.* During the period of inactivity, the plaintiff tenant's ceiling began to leak, and he placed several calls to the landlord to have the leaks repaired. *Id.* at *1–2. Three days after the first report, the maintenance supervisor appeared at the plaintiff's apartment, punched a hole in the ceiling to drain the water, and told the tenants not to enter that room. *Id.* at *2. The plaintiff entered the room only to empty the buckets collecting drained water. *Id.* On one such occasion, a large piece of sheetrock dislodged and injured him. *Id.* This Court found the landlord's attempts to correct this dangerous condition "woefully inadequate," falling far short of the degree of

forethought expected of prudent men. *Id.* at *3–*4.

Where the landlords in *Sneed* and *Arzanzarrin* undertook repairs for the benefit of their tenants, it appears that Mr. Sulcer was acting for the mutual benefit of his tenants and himself. Although Mr. Quimby had asked him several times to have the tree trimmed for safety reasons, the record reflects that a re-graveling project[4] prompted Mr. Sulcer's action. Mr. Sulcer identified a 25–to 30–foot long limb positioned approximately 20 feet high, with a diameter of approximately 12 to 14 inches, as one of the offending limbs to be pruned. He asked an inexperienced and unenthusiastic tenant to cut this limb with a chainsaw, in proximity to a home with occupants including a two-year old child.

He concedes he selected Mr. Quimby to act on his behalf (as an independent contractor)[5] to perform this service for no compensation. He did this despite know-

---

**4.** He undertook to have the overgrown limbs trimmed to facilitate the re-graveling of an access road on his farm.

**5.** Although we perceive Mr. Sulcer's duty to Ms. Allen as the dispositive issue rather than his duty as an employer of an independent contractor, we do note that an employer of an independent contractor has a duty to exercise reasonable care in selecting who will perform the work. *Marshalls of Nashville, Tenn., Inc. v. Harding Mall Assoc., Ltd.*, 799 S.W.2d 239, 243 (Tenn.Ct.App.1990). For an employer to be held liable for negligence in selecting an incompetent contractor, the employer must have known, or through reasonable care been able to ascertain, that the contractor was not qualified for the work at issue. *Mooney v. Stainless, Inc.*, 338 F.2d 127, 131 (6th Cir. 1964); *Marshalls of Nashville*, 799 S.W.2d at 243. Further, Section 411 of the Restatement (Second) of Torts addresses negligence in the selection of an independent contractor and, provides that

[a]n employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor

(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or

(b) to perform any duty which the employer owes to third persons.

Restatement (Second) of Torts § 411 (1965). Comment (c) further provides that

[t]he amount of care which should be exercised in selecting an independent contractor is that which a reasonable man would exercise under the circumstances, and therefore varies as the circumstances vary.

Certain factors are important: (1) the danger to which others will be exposed if the contractor's work is not properly done; (2) the character of the work to be done— whether the work lies within the competence of the average man or is work which can be properly done only by persons possessing special skill and training; and (3) the existence of a relation between the parties which imposes upon the one a peculiar duty of protecting the other.

Restatement (Second) of Torts § 411 cmt. c. (1965).

ing Mr. Quimby did not like heights; did not want to perform this work; was a commercial truck driver, not a tree trimmer; and had no experience pruning large limbs from significant heights. Mr. Sulcer states that he did nothing more than secure Mr. Quimby's services and identify the limbs. He did not inquire into safety precautions or any other methods Mr. Quimby might use.

Mr. Sulcer argues that he had no duty to Ms. Allen because the danger of falling limbs was open and obvious; and, because the danger was so open and obvious, it was not foreseeable that Mr. Quimby would allow her to collect the limbs or be anywhere near the work site. For many years, Tennessee courts ruled that a landlord had no duty to act with regard to open and obvious dangers on their land. *Coln v. City of Savannah*, 966 S.W.2d 34, 37 (Tenn.1998), *overruled on separate grounds by Cross v. City of Memphis*, 20 S.W.3d 642 (Tenn.2000). In *Coln v. City of Savannah*, the Tennessee Supreme Court considered the viability of the "open and obvious" rule in light of the more recently adopted comparative fault principles. *Coln*, 966 S.W.2d 34 (Tenn.1998). The court stated:

> [W]e conclude that an open and obvious danger does not automatically result in a finding of no duty and therefore no landowner liability. As in any negligence action, we think a risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by a defendant's conduct outweigh the burden upon the defendant to engage in alternative conduct that would prevent the harm.

*Coln*, 966 S.W.2d at 37. Limbs falling from a tree is an obvious danger; nevertheless, under the balancing test above, the danger posed was not so obvious as to relieve Mr. Sulcer of his duty to hire a competent tree trimmer. Mr. Sulcer created an unreasonable risk of harm when he asked an unskilled tenant to conduct work that is dangerous. The arborist's report submitted by Ms. Allen (and challenged by Mr. Sulcer in a motion to strike) explains the dangerous nature of tree trimming. Common sense leads to the same conclusion. The risk of injury from falling limbs is foreseeable when, in particular, the limb to be cut is 25 to 30 feet long and 20 feet off the ground, and the one doing the cutting does not like heights or have experience in pruning such limbs safely. Where the force of a falling limb this size is predictable, its trajectory while falling and after striking the ground is not. This unpredictability makes the risk of injury from a falling limb more salient when unskilled hands attempt the task. The gravity of harm is significant, as shown by Ms. Allen's injuries, which are not anomalous in light of the limb's predictable force of impact. The alternatives available to Mr. Sulcer ranged from discussing pruning methods to offering assistance to hiring a professional tree trimmer, all of which, to varying degrees, would have materially lowered or eliminated the probability of such harm with very little burden to the defendant.

■ We find that Mr. Sulcer had a duty to select someone who would know how to minimize the risk of trimming such large branches. Engaging an unskilled and tentative tenant to trim a limb of this size and height at that particular location created a foreseeable probability of harm. Although falling limbs are obviously dangerous to the reasonable person on the ground, the unpredictable trajectory of a large limb improperly trimmed makes the risk unreasonable. Mr. Sulcer knew there were other occupants, including a two year old child, on the premises; identified the limb and so appreciated its size; and did not avail himself of any measures to lower the

chances of harm to his tenants. The prudent person acting with the expected "degree of forethought and intelligence" would perceive the risk and take steps to limit it.

 In his summary judgment motion, Mr. Sulcer also contended that Ms. Allen was more than 50% at fault in sustaining her injuries. The trial court never specifically addressed these issues and instead focused upon the vicarious liability aspect of the motion. The unreasonable risk in this case was the selection of Mr. Quimby to prune the limb in question, not Ms. Allen's presence in the vicinity. Her presence, certainly, implicates the question of comparative negligence, but Mr. Sulcer did not carry his burden on this point. As we noted earlier, the record contains very little information about where Ms. Allen was standing at the time she was injured. It reveals that she was *not* under the tree but, beyond that, tells little more. Mr. Sulcer avers nothing more specific than the fact that Ms. Allen was in the vicinity. There remains a genuine issue as to the reasonableness of Ms. Allen's conduct. These questions are for the jury. If an application of the balancing test yields a duty of care on the part of the defendant, the facts supporting an open and obvious risk of danger remain relevant to the comparative fault analysis. *Id.* at 43. Some of the relevant considerations for this analysis include:

(1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requir-

ing a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Id.* at 44 (citing *Eaton v. McLain,* 891 S.W.2d 587, 594 (Tenn.1994)).

We see nothing in the record that would entitle Mr. Sulcer to summary judgment. He neither negated the element of Mr. Sulcer's duty of care as a landlord nor conclusively established an affirmative defense. On the other hand, there is abundant support for the conclusion that Mr. Sulcer owed Ms. Allen a duty of care to engage an individual competent to prune the limbs. Although we find that Mr. Sulcer did not carry his burden on the issue of comparative fault, we express no opinion beyond whether he met this exacting standard for the purposes of summary judgment.

It was error to grant summary judgment for the defendant. We reverse the trial court's summary judgment on the issue of duty of care and remand this case to the trial court for further proceedings consistent with this opinion. Costs of this appeal are taxed to the Appellees, William E. Sulcer, individually, William E. Sulcer and Ella Will Sulcer, Trustees and Lifetime Beneficiaries of the Sulcer Family Trust, and the Sulcer Family Trust, for which execution shall issue if necessary.