IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 11, 2019 Session

## SANDRA ANN PIPPIN v. CHRISTINA MICHELLE PIPPIN

**Appeal from the General Sessions Court for Wilson County**
**No. 2018-CV-2, 18-AD-242      John Thomas Gwin, Judge**

_____

### No. M2018-00376-COA-R3-CV
_____

The non-biological parent of a child born by artificial insemination to a woman with whom the non-biological parent had maintained a long term relationship and who had lived with the child, holding herself out as one of the child's parents, filed a petition to establish her parentage of the child and to set a parenting schedule; the petition was dismissed on the basis that she lacked standing; the trial court also awarded the petitioner visitation with the child. Upon our review, we affirm the dismissal of the petition and vacate the order setting visitation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed in Part and Vacated in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which W. NEAL MCBRAYER, J., joined. ANDY D. BENNETT, J., filed a dissenting opinion.

Abby R. Rubenfeld, Nashville, Tennessee, for the appellant, Sandra Pippin

Jacqueline B. Dixon, Nashville, Tennessee, for the appellee, Christina Pippin

Tiffany D. Hagar, Lebanon, Tennessee, Guardian *ad Litem*

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

This appeal involves a petition for parentage that was dismissed pursuant to Rule 12.02 of the Tennessee Rules of Civil Procedure. A child ("Child") was born in November 2011 through artificial insemination after his biological mother, Christina Pippin, and her partner, Sandra Pippin, made the mutual decision to have a child and to have Christina carry the baby. Child was raised by both Christina and Sandra together as

what Sandra characterizes as "equal parents" until December 2016, when the couple ended their 9 1/2 year relationship. Though Christina legally changed her last name to that of Sandra's in the spring of 2011 when she was pregnant with Child, the couple never married. When they ended their relationship, Sandra moved out of the parties' home along with her son ("J."), whom she had adopted prior to beginning the relationship with Christina.

On January 4, 2018, Sandra filed a petition in the Wilson County General Sessions Court, Family Court Division,[1] seeking to establish what she called "de facto parentage" of Child and to set a schedule to allow her to have parenting time with him. Among other things, the petition alleged:

10. . . .

> d. In 2009, the parties began discussing adding another child to their family, which they also discussed with their extended families and friends, based on their mutual intent and commitment to have and raise another child together as equal parents;
> e. In late 2010/early 2011, the parties executed a sworn Domestic Partner Affidavit to verify that they were a family, together supporting each other and both children, which allowed Respondent and both children to be added to Petitioner's employee health plan;
> f. Because same sex marriage was not yet legal throughout the country, including in Tennessee, the parties discussed that their relationship and their commitment to each other and their family was just as strong without that legal recognition, although Petitioner proposed to Respondent nonetheless and gave her a bread-tie ring, later replacing that with a real ring and then a larger one when Respondent legally changed her surname to Petitioner's.
> ***

13. . . .

> f. Petitioner was present for [Child]'s birth . . . was the first person to hold [Child] after birth, accompanied [Child] to the neonatal intensive care unit (NICU) immediately after his premature birth, and was the first person to change [Child]'s diaper;
> ***
> i. Petitioner's family members, friends, and colleagues were told and understand that she has two sons, and she has photographs of both [Child] and [J.] in her office; and,

---

[1] Tennessee Code Annotated section 37-1-104(f) gives juvenile courts jurisdiction to establish the paternity of children born out of wedlock; section 16-15-501 gives general sessions courts concurrent jurisdiction with circuit and chancery courts in domestic relations cases.

j. Petitioner was known to [Child] from birth as "Momma Sandy" and Respondent was known to him as "Momma Christy," by agreement of and equal participation by the parties.

14. Since birth, both parties have taught [Child] that they are his equal parents, and he has never questioned that and never been told that the parties are anything other than equal parents to him; [Child] has grown up knowing [J.] as his brother, and the four members of the household have functioned as a nuclear family of two parents and two children for the entirety of [Child]'s life.

15. The record is clear that the parties regarded themselves as a committed couple raising two sons together, regardless of who had what legal relationship with each child . . .

\*\*\*

17. The parties continued their joint commitment to being equal parents of [Child] after his birth, as evidenced by the following, among other things:

a. [Child] has grown up being taught and considering Petitioner's extended family as his family, calling Petitioner's mother "Grandma Marilyn," Petitioner's sisters "Aunt Jenny," "Aunt Debby," and "Aunt Clara," and Petitioner's nieces and nephews his "cousins";

\*\*\*

c. Throughout [Child]'s life, the parties shared household responsibilities for the family, with Respondent as a stay-home mom with responsibility for most of the domestic chores, and Petitioner being the primary breadwinner for the family and paying most family expenses, including providing health insurance coverage for the entire family through her employment, and most other expenses associated with raising [Child];

d. Petitioner regularly took both children shopping for clothing, school supplies, and other necessities;

\*\*\*

i. By agreement with and the approval of Respondent, Petitioner was listed as [Child]'s other parent on all registration forms and in all directories, and regularly attended parent/teacher conferences for him;

j. Petitioner was also listed as [Child]'s other parent on registration forms for his extra-curricular soccer and wrestling classes, for which she paid;

k. When not traveling for work, Petitioner regularly woke [Child], got him dressed and ready for the day, made and fed him breakfast, and dropped him off at daycare or school; and,

\*\*\*

45. Petitioner relied on the representations and behavior of Respondent that

3

the parties are equal co-parents and she has considered [Child] to be her son since his birth, willingly and joyfully assuming all obligations of parenthood, without any expectation of financial compensation, including providing financial assistance for [Child], taking care of him physically and emotionally, and engaging in all of the things that parents do for their children.

46. In addition, Petitioner has been [Child]'s primary source of financial support since his birth, even after the separation of the parties, and she is prepared to continue doing that since she is and has always been his second parent.

47. Petitioner has been in a parental role to [Child] for his entire six years of life, and thus has established a bonded, dependent relationship with him, completely parental in nature.

\*\*\*

90. There is functionally no difference between a married and an un-married partner where the biological parent chooses to conceive using donor insemination and where she specifically invites and intends for a partner to raise the child together with her as an equal parent — as the facts plainly establish here. See, e.g., *Partanen v. Gallagher*, 59 N.E.3d 1133 (Mass. 2016) (in related context, person without biological connection to child may be child's "presumed parent" under statute providing man is presumed to be father of child born out of wedlock if he, jointly with mother, received the child into their home and openly held out child as their child).

In motions filed on January 9, Sandra sought to have a guardian *ad litem* appointed and for a temporary parenting schedule "so as to preserve the *status quo* by allowing Child to continue seeing, and to maintain the close, loving, and parent/child relationship he has with both of the people he has been taught to consider his parents." On January 18, the court held a hearing on the motions; by order entered January 22, the court appointed guardian *ad litem* and reserved the other matters for hearing on February 1.

Following the February 1 hearing, the court entered an order holding that it was in Child's best interest to continue having parenting time with Sandra and setting a temporary parenting schedule that permitted Sandra to have time with him every other weekend; the court also ordered the parties to submit a proposed temporary parenting schedule. On February 2, Christina filed a motion to dismiss the petition and to stay the overnight visitation pending a hearing on the motion. The motion to dismiss, filed pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure, asserted that the petition failed to state a claim for relief as "the parties were never married, and [Child] is the biological child of Respondent, and is not the biological child, adopted child, or step-child of Petitioner, [thus] Petitioner has no standing under Tennessee law to seek parenting time."

4

A hearing on the motion to dismiss was held on February 15, at the end of which time the court orally granted the motion; Sandra moved for a stay to allow visitation to continue pending her appeal. On February 26, the trial court entered the order memorializing its oral ruling and denying the stay sought by Sandra. On March 14 Sandra moved to alter or amend that portion of the order denying the stay so that visitation could continue pending resolution of the appeal; following a hearing, the court granted the motion and permitted visitation between Sandra and Child on the first and third Saturdays of each month.[2]

Sandra filed a timely notice of appeal and states the following issues for resolution:

I.      Do the Tennessee parentage presumption statutes, read in a gender-neutral way as required by T.C.A. §1-3-104 and by established constitutional law, provide standing for an unmarried adult who is not related to a child by biology or adoption, particularly where, as here, that adult participated in the intentional conception of that child, voluntarily and without expectation of compensation helped raise him for years until this case, supported him financially and emotionally, took him into her home and held him out to the world as her natural son, and whom that child was taught by his biological parent is his other parent?

II.     Does Tennessee common law provide standing for an unmarried adult who is not related to a child by biology or adoption if the statutory parentage scheme does not apply, particularly where, as here, that adult participated in the intentional conception of that child, voluntarily and without expectation of compensation helped raise him for the first 6 years of his life until this case, supported him financially and emotionally, held him out to the world as her natural child, loved him, and parented him, and whom that child was taught by his biological parent is his other parent?

III.    Does an unmarried legal parent waive her superior constitutional right to raise and control her child when she voluntarily and intentionally permits and encourages that child to have a bonded, parent/child relationship with another adult who lives with, supports, loves, and coparents her child for almost all of the child's life, and where it will cause harm to the child to

---

[2] The court entered an "Abstract Order Regarding Petitioner's Visitation and Contact with Child" on April 6 in which it: awarded visitation to Sandra on the first and third Saturday of each month as well as one phone call per week, awarded holiday visitation to Sandra on December 26 of each year, restrained the parties from discussing the case with Child, and ordered the parties "to facilitate and encourage a relationship between the child and the other party consistent with the best interest of the child."

suddenly sever the relationship his legal parent encouraged him to have with the person he regards as his other parent?

IV. Are *In re Thompson*, 11 S.W.3d 913 (Tenn. App. 1999), and *In re Hayden C.G.-J*, S.W.3d (Tenn. App. 2013), 2013 WL 6040348, based on *Thompson*, no longer controlling of the issue presented here given the reversals of the authority on which they were based and since they have been substantially undermined by changes in Tennessee law, Tennessee families, and federal constitutional law since they were decided?

Christina raises the following additional issues:

[I]. The issue of whether Appellant is a parent, based on the language of Tenn. Code Ann. [§] 36-2-304, the presumption of parentage statute, with standing to pursue this action was not raised in the trial court and is not properly before this Court.

[II]. The trial court erred when it granted visitation to appellant after it dismissed her petition.

[III]. This case should be remanded to the trial court for a determination of the amount of attorney's fees to be paid by Appellant to appellee pursuant to Tenn. Code Ann. [§] 20-12-119(c)(1) and other authority.

[IV]. Appellee should be awarded her attorney's fees on appeal or awarded damages for a frivolous appeal and the costs of this appeal should be assessed to appellant.

## II. STANDARD OF REVIEW

The purpose of a Tenn. R. Civ. P. 12.02(6) motion to dismiss is to determine whether the pleadings state a claim upon which relief can be granted. A Rule 12 motion only challenges the legal sufficiency of the complaint. It does not challenge the strength of the plaintiff's proof. *See Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999). "[M]atters outside the pleadings should not be considered in deciding whether to grant the motion." *In re Francis P.*, 532 S.W.3d 356, 365 (Tenn. Ct. App. 2017), *appeal denied* (Sept. 22, 2017) (quoting *Trau– Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696 (Tenn. 2002)). In reviewing a motion to dismiss, we must liberally construe the complaint, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences. *See Pursell v. First American National Bank*, 937 S.W.2d 838, 840 (Tenn. 1996); *see also Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696-97 (Tenn. 2002). Thus, a complaint should not be dismissed for failure to state a claim unless it appears that the

plaintiff can prove no set of facts in support of his or her claim that would warrant relief. *See Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999); *Fuerst v. Methodist Hospital South*, 566 S.W.2d 847, 878 (Tenn. 1978). Making such a determination is a question of law. Our review of a trial court's determinations on issues of law is *de novo*, with no presumption of correctness. *Frye v. Blue Ridge Neuroscience Center, P. C.*, 70 S.W.3d 710, 713 (Tenn. 2002); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn 2000); *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

The issues raised require that we construe several statutes. The construction of a statute is a question of law and is reviewed *de novo. Lee v. Franklin Special Sch. Dist. Bd. of Educ.,* 237 S.W.3d 322, 332 (Tenn. Ct. App. 2007). When construing a statute, a court must "ascertain and give effect to the legislature's intent." *Home Builders Ass'n of Middle Tenn. v. Williamson Cnty.,* 304 S.W.3d 812, 817 (Tenn. 2010). Ordinarily, we derive this legislative intent "'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.'" *Id.* (quoting *State v. Flemming,* 19 S.W.3d 195, 197 (Tenn. 2000)). Where "the language of a statute is ambiguous in that it is subject to varied interpretations producing contrary results, *Walker* [*v. Sunrise Pontiac–GMC Truck, Inc.,*] 249 S.W.3d [301,] 309 [(Tenn. 2008)], we construe the statute's meaning by examining 'the broader statutory scheme, the history of the legislation, or other sources.'" *Id.* (quoting *State v. Sherman,* 266 S.W.3d 395, 401 (Tenn. 2008)).

### III. ANALYSIS

### A. Standing

The trial court dismissed the petition, stating that it was "being asked to create a new category of parent in Tennessee" — "a de facto parent." The court further opined that there "is no such thing in Tennessee . . . except on the street and in real life; there are all sorts of de facto parents, but the law gives them no rights." The court concluded that Sandra had no standing to pursue being named the parent of Child. Sandra asserts that Tennessee Code Annotated sections 68-3-306 and 36-2-304(a)(4), read and applied in a gender-neutral manner, give her standing to seek to establish parentage and visitation rights. We address the statutes separately.

Standing is a judicial doctrine used to determine whether a party is "entitled to have a court decide the merits of a dispute." *Am. Civil Liberties Union of Tenn. v. Darnell,* 195 S.W.3d 612, 619 (Tenn. 2006). The doctrine of standing precludes courts from adjudicating "'an action at the instance of one whose rights have not been invaded or infringed.'" *Mayhew v. Wilder,* 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001) (quoting 59 AM.JUR.2D. *Parties* § 30 (1987)). More specifically, this doctrine "restricts '[t]he exercise of judicial power . . . to litigants who can show 'injury in fact' resulting from the

action which they seek to have the court adjudicate.'" *In re Estate of Farmer,* No. M2013-02506-COA-R3-CV, 2014 WL 5308226, at \*12 (Tenn. Ct. App. Oct. 15, 2014) (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 473 (1982)). Where the person seeks to base his or her standing on a statute, he or she must show that the "'claim falls within the zone of interests protected or regulated by the statute in question.'" *State v. Harrison,* 270 S.W.3d 21, 28 (Tenn. 2008) (quoting *Wood v. Metro Gov't of Nashville & Davidson Cnty,* 196 S.W.3d 152, 158 (Tenn. Ct. App. 2005)).

Pertinent to the issue of standing presented in this case is the following holding from *In re Thompson*, in which this Court considered the question of "whether a petition for visitation may be brought by a woman who, in the context of a long-term relationship, planned for, participated in the conception and birth of, provided financial assistance for, and until foreclosed from doing so by the biological mother, acted as a parent to the child ultimately borne by her partner." *In re Thompson*, 11 S.W.3d 913, 915 (Tenn. Ct. App. 1999). We held:

> While Tennessee's legislature has generally conferred upon parents the right of custody and control of their children, it has not conferred upon . . . a nonparent who is not and has not been married to either of the children's parents, but who previously maintained an intimate relationship with such a parent and who previously provided care and support to the children[] any right of visitation. Absent statutory authority establishing such a third-party's right to visitation, parents retain the right to determine with whom their children associate.

*Id*. at 918–19, 923 (Tenn. Ct. App. 1999).

1. Tennessee Code Annotated section 68-3-306

Tennessee Code Annotated section 68-3-306, which provides that "[a] child born to a married woman as a result of artificial insemination, with consent of the married woman's husband, is deemed to be the legitimate child of the husband and wife," is a part of the Vital Records Act of 1977, codified in Chapter 3 of Title 68, part 3 of which relates to births. Section 306 follows section 305, entitled "Father's name on birth certificate – Surname of child," and which sets out in great detail the manner by which a child's father's name is entered on the child's birth certificate and, particularly, the manner in which the father's name is determined and added to the certificate, if the father is not married to the mother.[3] Consistent with the wording and intent of section 305, section

---

[3] Section 305(a)(1) provides that "[i]f the mother was married at the time of either conception or birth, or anytime between conception or birth, to the natural father of the child, the name of the natural father shall be entered on the certificate . . . ."

306 declares that a child born to a married woman by artificial insemination is also a child of the woman's husband, thereby allowing the name of the husband of the married woman who has borne the child to be entered as the child's father on the birth certificate. In the context of the broader statutory scheme, section 306 does not create the relationship that Sandra advocates or confer any rights of parentage; the "marriage-neutral" construction Sandra urges is a strained interpretation of the natural and ordinary meaning of the statutory language.

Even if section 68-3-306 were construed to create a right of visitation on the part of the husband of a woman who has given birth to a child by artificial insemination, that right would be predicated upon the child being born to a married woman. Inasmuch as Sandra's petition stated that she and Christina were not married at the time of Child's birth nor at any time afterward, section 68-3-306 does not provide Sandra with standing and thus cannot be used to support a claim for visitation with Child.

2. Tennessee Code Annotated section 36-2-304

Tennessee Code Annotated section 36-2-304 provides in pertinent part that "[a] man is rebuttably presumed to be the father of a child if: . . . While the child is under the age of majority, the man receives the child into the man's home and openly holds the child out as the man's natural child." Tenn. Code Ann. § 36-2-304(a)(4). Sandra pled that she received Child into her home and held him out as her natural child, and argues that "us[ing] the actual language of the statute but substituting feminine for masculine words," she "fits within the presumptions that makes a person a 'parent' under the Tennessee Code, and thus has standing to pursue this case."

As an initial matter, we address Sandra's contention that reading section 36-2-304 in a gender-neutral way is required by section 1-3-104(b) ("Words importing the masculine gender include the feminine and neuter, except when the contrary intention is manifest"), thereby creating a rebuttable presumption of parentage when a person like her receives a child, who is under the age of majority, into his or her home and openly holds the child out as that person's child. Applying the principles of statutory construction set forth above, we do not agree that recourse to section 1-3-104 is required or necessary to resolve the issue presented. The parentage statutes are not ambiguous, and to the extent applicable to our inquiry, the Legislative intent of the statutes is clear and can be derived "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." *Home Builders Ass'n of Middle Tenn.,* 304 S.W.3d 817. Moreover, to substitute "comparable feminine terms" for the words like "man" or "father," as Sandra proposes, goes beyond allowing words written in one gender be construed, where necessary, to apply to the other, and exceed the purpose of the parentage statute as stated in section 36-2-301, as more fully explained below. *See Sneed v. Henderson*, 366 S.W.2d 758, 759 (Tenn. 1963) (Allowing suit to proceed for the wrongful death of an infant's

9

mother, where wrongful death statute provided that action would pass "to his children or to his next of kin" but "applie[d] equally whether the deceased injured party be male or female."). No rights or relationships are created by the parentage statutes, only a procedure by which the father is able to establish parentage; as such, recourse to section 1-3-104(b) for other purposes is not warranted.

Chapter 2 of Title 36 of the Code addresses parentage; section 36-2-301 states that the purpose of the chapter is to "provide[] a single cause of action to establish parentage of children other than establishment by adoption pursuant to chapter 1 of this title, or by acknowledgement of parentage pursuant to §§ 68-3-203(g), 68-3-302 or 68-3-305(b)."[4] Tenn. Code Ann. § 36-2-301. Section 36-2-302(5) defines "parent" to mean "the biological mother or biological father of a child, regardless of the marital status of the father and mother"; it also defines "mother" as "the biological mother of a child born out of wedlock" (section 36-2-302(4)), and "father" as "the biological father of a child born out of wedlock." Tenn. Code Ann. § 36-2-302(4)(3). Section 36-2-305 permits a complaint to establish parentage of a child to be filed by the child, the child's mother, "a man claiming to be the child's father," or the department of human services or its contractor. Inasmuch as the Legislature has defined "father" in section 36-2-302, we cannot give a gender-neutral meaning to that term for purposes of section 36-2-304; to do so would extend both statutes' meanings beyond that set forth in the chapter. Like the statutes in chapter 1 of title 36, the statutes governing parentage contemplate a biological or genetic connection between the child and the putative parent. Sandra does not have a biological connection to Child and, accordingly, cannot fit this definition.

The Legislature has expressly created rights relative to child custody and visitation for biological parents, potential adoptive parents, grandparents, stepparents, and parents of "children born of donated embryo transfer." *See* Tenn. Code Ann. §§ 36-1-101 et seq. (adoption); 36-2-301 et seq. (biological fathers) 36-6-301 et seq. (grandparents and stepparents); 36-2-401 et seq. (children born of donated embryo transfer). It has not created the same such rights outside of these relationships. As Sandra does not fit into any of these categories, her claim falls outside the zone of interests protected or regulated by the statutes she references, rendering her without standing to pursue a parentage action or visitation with Child.

---

[4] Chapter 1 of Title 36 governs adoption, and section 102 defines "parent" as "any biological, legal, adoptive parent or parents or, for purposes of §§ 36-1-127 -- 36-1-141, stepparents." Tenn. Code Ann. § 36-1-102(36). A "legal parent" is defined as the biological mother of a child; a man who is or has been married to the biological mother of the child or who attempted to marry the mother of the child; a man who has been adjudicated to be the legal father of the child or who has signed a sworn acknowledgement of paternity; or an adoptive parent. Tenn. Code Ann. § 36-1-102(28)(A). Based on the facts alleged in the petition, Sandra is not a biological parent, a legal parent, or step parent, and she did not seek to adopt Child; thus, she does not fit within any of these statutory definitions of a parent, even giving the statutes the wording she urges.

10

3. *De Facto* Parentage

Additionally, Sandra argues that she should be established as the *de facto* parent of Child. The guardian *ad litem* also urges that we adopt this concept and apply it to the facts at hand to conclude that Sandra has standing in this matter. Adherence to precedent prevents us from adopting such an approach; prior cases have expressly declined to adopt the "de facto" parent definition of parentage for the purposes at hand. In *In re Thompson*, this Court observed:

> While it *may* be true that in our society the term "parent" has become used *at times* to describe more loosely a person who shares mutual love and affection with a child and who supplies care and support to the child, we find it inappropriate to legislate judicially such a broad definition of the term "parent" as relating to legal rights relating to child custody and/or visitation. Just as a grandparent who provides care and support to a child does not become recognized as being a parent (absent adoption) under Tennessee law, other persons are not recognized as being a parent under Tennessee law based *only* upon prior care and support of a child. These other persons include any unmarried persons who maintain a close intimate relationship with a child's natural parent, whether they are of the same or opposite sex of that natural parent.
>
> ***
>
> . . .[W]e are unaware of and have not been cited to any prior controlling precedent that has utilized the concept of either *de facto* parenthood and/or *in loco parentis* to extend constitutional parental rights, including the right to visitation, to unmarried/unrelated persons in [the appellants'] position.

11 S.W.3d at 918–19, 923.[5] Fourteen years later, in *In re Hayden C.G-J.*, No. M2012-02701-COA-R3-CV, 2013 WL 6040348, at *1 (Tenn. Ct. App. Nov. 12, 2013), this Court again considered facts similar to those in this case and concluded that the unmarried former partner of a legal parent did not have standing to seek visitation with a child the couple had raised together for the first 4 1/2 years of the child's life, stating that

---

[5] We are not persuaded by Sandra's argument that *In re Thompson* is "no longer controlling of the issue presented here given the reversals of the authority on which [it] was based." She cites *Alison D. v. Virginia M.*, 572 N.E.2d 27 (N.Y. 1991), *overruled by Brooke S.B. v. Elizabeth A.C.C.*, 61 N.E.3d 488 (N.Y. 2016), as being "relied heavily" on in *In re Thompson*; however, *Alison D.* is one of four cases discussed in *In re Thompson* in similar depth, and the other three cases, from the States of California, Vermont, Florida, have not, as of this writing, been overruled.

11

"no statute gives [the petitioner] a legal right or interest regarding visitation with [the child]" and that, in light of the Legislature's decision to not change the definition of parent or legal parent, the petitioner's arguments that she had standing under the concepts of in loco parentis and/or de facto parent also "lack[ed] a legal foundation." *Id.* at *1, *4. Although significant changes in the legal landscape regarding the recognition of same-sex marriage have taken place since *In re Hayden C.G-J.* was decided, the holding in that case remains applicable to the facts of this case because the parties were unmarried.[6]

Inasmuch as Sandra's claim for visitation does not fall within the zones of interests protected by the parentage statutes, she does not have standing to pursue visitation; accordingly, we affirm the judgment of the trial court dismissing the petition.[7]

## B. Visitation

By order entered May 2, 2018, the trial court granted Sandra visitation with Child pending resolution of all appeals, finding that it was not in Child's best interest to be separated from Sandra through the appeal process, that minimum contacts between the two "are sufficient to maintain [Child's] relationship with [Sandra]," and that such minimum contacts were in Child's best interest. Christina contends that, in light of the fact that Sandra was not Child's biological mother, step-mother, adoptive mother, or grandmother, the court erred in granting visitation. Inasmuch as we have affirmed the dismissal of the petition and held that Sandra does not have standing to pursue visitation with Child, we vacate the order granting visitation. In so doing, we acknowledge the trial court's finding that Child's best interest is served by maintaining a relationship with Sandra, as well as her son J., and commend the court for its thorough and heartfelt ruling in that regard.

---

[6] Sandra's petition states that the parties did not marry, and she does not challenge any Tennessee marriage laws; thus, the issues presented in this appeal do not implicate the holdings of *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015). In *Grant v. Anderson*, this Court set forth the precise holdings of *Obergefell*:

> [T]he [United States Supreme] Court held that "the State laws challenged . . . in these cases are now . . . invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Id.* at 2605. The Court further held "that there is no lawful basis for a State to refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character." *Id.* at 2608.

No. M2016-01867-COA-R3-CV, 2018 WL 2324359, at *2 (Tenn. Ct. App. May 22, 2018), *appeal denied* (Oct. 10, 2018).

[7] Our holding that Sandra does not have standing to pursue visitation pretermits our consideration of the issue she raises as to whether Christina waived her superior parental rights when she permitted Sandra to parent Child.

## C. Attorney's Fees

Christina has asked that the case be remanded for a determination of an award of counsel fees as authorized by Tennessee Code Annotated section 20-12-119(c)(1), and for an award of fees as damages for a frivolous appeal. Upon a review of the petition, we conclude that an award of fees is precluded under subsection (c)(5)(E).[8]

This court is authorized by Tennessee Code Annotated section 27-1-22 to award damages, including attorney's fees, against the appellant if we determine the appeal is frivolous or that it was taken solely for delay; the statute is to be interpreted and applied strictly to avoid discouraging legitimate appeals. *Wakefield v. Longmire*, 54 S.W.3d 300, 304 (Tenn. Ct. App. 2001); *see Davis v. Gulf Ins. Group*, 546 S.W.2d 583, 586 (Tenn. 1977) (discussing the predecessor of Tenn. Code Ann. § 27-1-122). A frivolous appeal is one that is devoid of merit or has no reasonable chance of success. *Wakefield*, 54 S.W.3d at 304. The award of damages for the filing of a frivolous appeal lies within the sound

---

[8] Tennessee Code Annotated section 20-12-119 states:

> (a) In all civil cases, whether tried by a jury or before the court without a jury, the presiding judge shall have a right to adjudge the cost.
> * * *
> (c)(1) Notwithstanding subsection (a) or (b), in a civil proceeding, where a trial court grants a motion to dismiss pursuant to Rule 12 of the Tennessee Rules of Civil Procedure for failure to state a claim upon which relief may be granted, the court shall award the party or parties against whom the dismissed claims were pending at the time the successful motion to dismiss was granted the costs and reasonable and necessary attorney's fees incurred in the proceedings as a consequence of the dismissed claims by that party or parties. The awarded costs and fees shall be paid by the party or parties whose claim or claims were dismissed as a result of the granted motion to dismiss.
>
> * * *
> (5) This subsection (c) shall not apply to:
> * * *
>    (E) Any claim which is a good faith, non-frivolous claim filed for the express purpose of extending, modifying, or reversing existing precedent, law or regulation, or for the express purpose of establishing the meaning, lawfulness or constitutionality of a law, regulation or United States or Tennessee constitutional right where the meaning, lawfulness or constitutionality is a matter of first impression that has not been established by precedent in a published opinion by the Tennessee supreme court, court of appeals, court of criminal appeals, a United States district court in Tennessee, or by the United States supreme court. This subdivision (c)(5)(E) shall not apply unless at the time the successful motion to dismiss was filed the party that made the dismissed claim had specially pleaded in its latest complaint, counter-complaint or cross-complaint that the dismissed claim was made for one (1) of the express purposes listed above and cited the contrary precedent or interpretation the party seeks to distinguish or overcome, or whether the issue to be decided is a matter of first impression as described in this subdivision (c)(5)(E).

discretion of this Court. *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 547 (Tenn. Ct. App. 2005). In our discretion, we decline to award attorney's fees on appeal.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the trial court dismissing the petition is affirmed, and the order granting visitation between Sandra and Child is vacated.

_____

RICHARD H. DINKINS, JUDGE